[No. H019638. Sixth Dist. Aug. 2, 2000.]

METROPOLITAN PHILIP et al., Plaintiffs and Appellants, v.
BASIL STEIGER et al., Defendants and Appellants.

ANTIOCHIAN ORTHODOX CHRISTIAN ARCHDIOCESE OF NORTH
AMERICA et al., Plaintiffs and Appellants, v.
CONCILIAR PRESS, INC., et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part B. of the Discussion.

**COUNSEL**

Ajalat, Polley & Ayoob, Charles R. Ajalat; Ropers, Majeski, Kohn & Bentley and Susan Handelman for Plaintiffs and Appellants.

Comstock, Thompson, Kontz & Brenner and Austin B. Comstock for Defendants and Appellants Basil Steiger et al.

Sheppard, Mullin, Richter & Hampton, Robert J. Stumpf and Steven H. Winick for Defendants and Appellants Conciliar Press, Inc., et al.

## OPINION

**COTTLE, P. J.**—In this dispute between two factions in a church, we must tread lightly, both because the First Amendment demands it and because it is clear from the record that the opposing views are sincerely held. The church at issue here is located in Ben Lomond, California. Many of its members were among a group of persons who sought to worship as a true "New Testament" church—that is, in the manner of the earliest Christians. Prior to 1987, the Ben Lomond church was part of a 17-church national alliance of like-minded churches known as the Evangelical Orthodox Church (EOC). The leaders of the EOC came to believe that the Eastern Orthodox Church is the true successor to the New Testament Church, and that they should join one of its several "jurisdictions." The EOC churches ultimately agreed to join a jurisdiction known as the Antiochian Orthodox Christian Church (Antioch) and to submit to the authority of Metropolitan Philip, Antioch's highest ranking leader in North America.

Eleven years later, all but two of the dozen priests who led the Ben Lomond parish decided they wanted to leave Antioch, and they requested permission from Metropolitan Philip to do so. Metropolitan Philip responded by laicizing some of the priests, suspending the others, and sending new priests to lead the Ben Lomond parish.

Antioch subsequently filed suit seeking a legal determination that it is the rightful owner of the Ben Lomond parish's property, despite the fact that title stands in the name of a corporation formed before the EOC churches joined Antioch, and despite the fact that a majority of the former priests and parishioners of the Ben Lomond Parish wish to leave Antioch.

Antioch later filed a second suit seeking a determination that it is the rightful owner of Conciliar Press, Inc., a religious publishing operation affiliated with the Ben Lomond parish. The two actions were consolidated and a bench trial was held. The trial court entered judgment in favor of Antioch. We affirm because the question of which faction represents the "true" church entitled to the property is an ecclesiastical matter in which civil courts may not meddle.

## BACKGROUND

Most of the crucial facts in this case were largely undisputed at trial. St. Peter & St. Paul's Orthodox Church, Inc. (the Corporation) is a nonprofit

corporation that was originally formed in 1973 under the name "The Revival Center, Santa Cruz." The congregation that worshipped in Santa Cruz under that name eventually died out, and one of the incorporators "took" the Corporation with him to Ben Lomond. The Ben Lomond congregation first worshipped under the name "Wee Kirk Church" then "Holy Orthodox Christian Church" then "Wee Kirk Church" again. The Corporation's name was changed each time.

The church was originally congregational—that is to say, it was governed by majority rule of the congregation. In 1984, the congregation unanimously voted to "merge" with the Evangelical Orthodox Church of San Lorenzo Valley and to adopt its "Episcopal" form of government. Under this arrangement the Ben Lomond congregation came under the leadership and authority of then Bishop Weldon Hardenbrook.[1]

Hardenbrook was one of a group of men who had met in the Campus Crusades for Christ organization in the mid-1960's. The men kept in touch over the years and in the mid-1970's agreed to form a network of churches that was first called the New Covenant Apostolic Order. The leaders of the New Covenant Apostolic Order embarked on a study of church history and eventually concluded that the Eastern Orthodox Church had kept the original faith after the Great Schism. The New Covenant Apostolic Order was renamed as the EOC and the leaders began looking for a way to join one of the Eastern Orthodox Church's jurisdictions.[2] After discussions with various jurisdictions over a period of years, in 1987 most of the EOC churches decided to join Antioch.[3] The EOC bishops and priests were ordained as Antiochian priests, the members of the congregations were chrismated, and the EOC church buildings were consecrated as Orthodox.[4] Around this time the Ben Lomond church took its present name, St. Peter & St. Paul's Orthodox Church.

In what apparently was an unprecedented procedure, the EOC churches joined Antioch "intact"—that is as a group of 17 churches rather than as

[1] As will appear, Hardenbrook became a priest, not a bishop, upon joining Antioch, and he was subsequently laicized. We will refer to him simply as "Hardenbrook" in this opinion not out of a lack of respect for the titles he once held, but to avoid the awkwardness of using different titles depending on the time frame.

[2] There are 13 or 14 autocephalous jurisdictions of the Orthodox Church. Although the jurisdictions appear to be based on geography to some extent, apparently more than one of the jurisdictions have churches in North America.

[3] We note that the parties dispute how best to characterize the relationship. Appellants repeatedly say the EOC churches became "affiliated" with Antioch. It is clear to us that "affiliated" is a poor description of the relationship, because under Orthodox doctrine there is but one church. Thus we use "join," although we recognize that term may not be precise either.

[4] The EOC bishops could not become Antiochian bishops under Antioch's rules, so they became priests instead.

individual churches. Furthermore, after the union, the former EOC churches were to retain an identity under the title "Antiochian Evangelical Orthodox Mission" (AEOM), governed by the former leaders of the EOC. After time, however, the leadership decided it was time to end the status of the AEOM "as a special movement within our Archdiocese." Metropolitan Philip agreed.

While the AEOM was still in existence, it prepared a "model constitution" for its parishes to adopt. Among other things, the model constitution provided that the property of the church would go to Antioch in the event of dissolution of the local church. The model constitution contained no signature line, but it did have blanks to be filled in with information about the local church's name, location, and the like.

Although some parishes filled out the model constitution and submitted it to Metropolitan Philip, St. Peter & St. Paul's never did. One of Antioch's witnesses, a priest who did not join those who sought to leave Antioch, testified candidly that the leadership did not turn in the model constitution for the very reason that not doing so would give them "wiggle room" to argue that they could keep the property in the event of a dispute. Nevertheless, the evidence was clear that St. Peter & St. Paul's actually operated under a system like that set out in the model constitution. In a letter to the congregation, Hardenbrook once even quoted from the model constitution, describing it as "our Parish Constitution."

During all this time the only written bylaws the Corporation had were the ones originally prepared for the Revival Center in Santa Cruz and which reflected its congregational form of government. In 1998 written bylaws were prepared which purport to set forth how the Corporation actually operated from 1984 on. Those bylaws call for governance by a board of directors, but do not mention any higher ecclesiastical authority.

The relationship between St. Peter & St. Paul's and Metropolitan Philip apparently went well for several years. St. Peter & St. Paul's was run by a presbytery composed of the approximately one dozen priests of the parish, with Hardenbrook and certain others taking primary leadership roles.[5] Although there was evidence that some important decisions were made without consulting Metropolitan Philip, there was substantial evidence that the presbytery understood it was under his authority.

At some point dissension arose. On February 10, 1998, the presbytery voted 10 to 2 to seek permission from Metropolitan Philip to leave Antioch.

---

[5]Basil Steiger, the first-named party in Antioch's original complaint, was one of the priests who took a prominent leadership role.

At a church meeting February 12, 1998, a majority of the congregation reached the same decision. Metropolitan Philip had sent two priests from elsewhere to lead the February 12th meeting, but they were not allowed to do so.

By letter dated February 12, 1998, the priests and deacons who wanted to leave Antioch formally requested Metropolitan Philip's permission to do so. On February 14, 1998, Metropolitan Philip responded by laicizing Hardenbrook and one other priest, and by suspending the others for their "rebellion and disobedience."

The "Spiritual Court" of Antioch subsequently ruled that Hardenbrook is to be permanently laicized and excommunicated for at least five years and until he repents. The other clergy were laicized and excommunicated for a minimum of three years. The Spiritual Court expressly held that the Corporation and its property belong to Antioch under the control of the clergy who did not participate in the attempt to leave Antioch.[6] A ruling council in Damascus, Syria has upheld the property aspect of the Spiritual Court's decision.

Hereafter we will use "Hardenbrook group" to refer to those former priests and laypersons who sought to leave Antioch, or where context may require it, to the members of that group who were named as defendants in this action. We will use "Washburn group" to refer to the clergy and parishioners who did not seek to leave Antioch.

In the published portion of this opinion we address the Hardenbrook group's contentions that the trial court erred in finding that Antioch and the Washburn group are entitled to the Corporation and its property. In the unpublished portion of the opinion we address Antioch's cross-appeal, which challenges the trial court's decision not to require the Hardenbrook group to compensate Antioch for a decline in equity that allegedly occurred in Conciliar Press while it was under the control of the Hardenbrook group.

DISCUSSION

A.   *The appeal*

■   The Hardenbrook group's primary contention on appeal is that the trial court failed to resolve the issues by applying "neutral principles of law"

---

[6]We note that the Spiritual Court's decision contains many points which it candidly concedes are "unnecessary to the decision" and which appear designed largely to bolster the argument in this court that this is an ecclesiastical matter in which civil courts should not interfere. While the Spiritual Court's characterization of the issue as being ecclesiastical is not binding on us, we ultimately reach the same conclusion.

as described in *Protestant Episcopal Church v. Barker* (1981) 115 Cal.App.3d 599, 611 [171 Cal.Rptr. 541] (*Barker*). In *Barker*, four churches withdrew from the Protestant Episcopal Church in the United States of America (PECUSA) and its Los Angeles diocese. (*Id* at p. 604.) PECUSA and the diocese sued to obtain title and possession of the property of the churches. (*Ibid.*) The property was held in the name of four California nonprofit corporations that had been formed to operate the respective churches. (*Ibid.*)

The trial court in *Barker* concluded that the local church corporations held the property in trust for the diocese and PECUSA under either an implied trust theory or the so-called hierarchical theory. (*Barker, supra,* 115 Cal.App.3d at pp. 604-605.) Under the hierarchical theory "centralized church control over church property supersedes civil law disposition of church property. Under a hierarchical system of church governance the canons and rules of the general church override any disposition of local church property mandated by state law." (*Id.* at p. 605.)

The appellate court in *Barker* held that the trial court erred in relying on hierarchical theory. "[W]e conclude that California has adopted neutral principles of law as the basis for resolution of church disputes; that use of the hierarchical theory is restricted to doctrinal and ecclesiastical controversies and does not extend to property disputes; that property disputes between ecclesiastical claimants, like property disputes between temporal claimants, must be resolved by neutral principles of law." (*Barker, supra,* 115 Cal.App.3d at p. 615.)[7]

The *Barker* court further held that the trial court erred in applying an implied trust theory. "In essence, the theory of implied trust rests on the proposition that contributions and gifts to the local church are impliedly given in trust for the benefit of the general church—that the beneficiaries of such contributions are Protestant Episcopalians at large rather than members of the parish. The theory of implied trust thus rejects the named trustee (the local church) and the known beneficiaries (the local congregation) in favor of distant trustees (the Diocese and PECUSA) and unknown beneficiaries (Protestant Episcopalians in general)." (*Barker, supra,* 115 Cal.App.3d at p. 616.) The *Barker* court found this theory unsatisfactory because "[t]he

---

[7]A dissenting justice argued persuasively in *Barker* that courts should continue to apply hierarchical theory where doing so would more likely reflect what the parties contemplated upon forming the relationship between the local church and the general church. (*Barker, supra,* 115 Cal.App.3d at pp. 627-628 (dis. opn. of Roth, P. J.).) As will appear, we need not decide whether the majority or the dissent in *Barker* is correct, because the case is distinguishable and we are required to defer to the ecclesiastical authorities on the facts here, even under the *Barker* majority's reasoning.

implied trust theory almost inevitably puts the civil courts squarely in the midst of ecclesiastical controversies, in that every dispute over church doctrine which produces strongly held majority and minority views forces the court to determine the true implied beneficiaries of the church entities involved. If the civil courts cannot properly determine which competing group is the bearer of the true faith, they cannot determine for whose benefit title to church property is impliedly held in trust." (*Id.* at p. 618.)

After concluding that neither hierarchical theory nor an implied trust theory applied, the *Barker* court turned to the theory of express trust. "In determining the presence or absence of an express trust in specific church property a court will look at four general sets of facts: (1) the deeds to the property, (2) the articles of incorporation of the local church, (3) the constitution, canons, and rules of the general church, and (4) relevant state statutes, if any, governing possession and disposition of such property." (*Barker, supra,* 115 Cal.App.3d at p. 621.) The *Barker* court reviewed those four sets of facts for each of the four churches in issue, and concluded that there was an express trust only in one case. (*Id.* at pp. 625-626.) The court therefore reversed the judgment as to three of the churches, and affirmed as to one. (*Ibid.*)

Here, the Hardenbrook group argues that while the trial court said it intended to apply "neutral principles of law" in accordance with *Barker*, it thereafter misapplied the law to the facts. Most of the Hardenbrook group's briefing is devoted to arguing there was no express trust, given that the Corporation's articles and bylaws did not reference Antioch, and given that the church never filled out the model constitution or turned it in.

We think the Hardenbrook group's reliance on *Barker* is misplaced and that its arguments regarding the existence or nonexistence of an express trust are misdirected. Despite the nominal alignment of the parties, the real question in this case was not whether the property belonged to the general church or to a seceding local church, but rather which of the two local groups is entitled to possession and use of the property. Thus, the case falls not under *Barker*'s express trust analysis, but under its observation that civil courts are "ill-equipped" to resolve disputes over which faction represents the "true" church. The United States Supreme Court has noted that the existence of two factions within a local church presents a "significant complicating factor" that requires a different form of analysis than cases that, like *Barker*, involve only the secession of an entire local church. (*Jones v. Wolf* (1979) 443 U.S. 595, 606, 607 [99 S.Ct. 3020, 3027, 3028, 61 L.Ed.2d 775].)

The more pertinent authority, therefore, is not *Barker*, but *Korean United Presbyterian Church v. Presbytery of the Pacific* (1991) 230 Cal.App.3d 480 [281 Cal.Rptr. 396] (*Korean*). In *Korean*, as here, a primary leader of the local church, Rev. Woo, persuaded a majority of the congregation that the church should leave the denomination. (*Id.* at p. 487.) As here, the higher authority in the general church responded by appointing new leadership for the local church. (*Id.* at p. 494.) As here, the authorities within the general church determined that the minority represented the true church and that it was entitled to possession of the church property. (*Ibid.*)

The trial court in *Korean* entered a judgment leaving Rev. Woo and the majority in control of the property. (*Korean, supra*, 230 Cal.App.3d at pp. 494-495.) The appellate court reversed on three separate and independent grounds. (See *id.* at p. 506 ["The judgment below is reversible on either of the grounds discussed above . . ."; followed by discussion of third ground for reversal].) The court titled its first ground for reversal as "The decision of the superior court violates the First and Fourteenth Amendments by substituting the court's judgment for the judgment of [church authorities] regarding the identity of the particular church entitled to use and enjoy the Church property, a question of church doctrine and polity." (*Id.* at p. 500, italics omitted.) The court explained that under well-established precedent, the question of which group is the "true" church is " 'clearly ecclesiastical' " and that therefore the ecclesiastical authorities' determination of the issue is "binding and conclusive on the trial court." (*Id.* at pp. 500-503.) The same applies here.

The Hardenbrook group attempts to distinguish *Korean* on the ground that in that case the local church's articles of incorporation and bylaws expressly referred to the general church and its authority. We reject this distinction for two related reasons. First, the *Korean* court made no mention of the local church's articles of incorporation or bylaws in that portion of its decision setting out the first independent ground for reversal; the articles and bylaws were relevant only to the second and third grounds for reversal. In discussing the first ground for reversal, the court relied on provisions in the general church's governing documents, not the local church's documents. (*Korean, supra*, 230 Cal.App.3d at p. 500 [quoting extensively from general church's "Book of Order"].) This is consistent with the United States Supreme Court's language in *Jones v. Wolf, supra*, 443 U.S. at pages 607-608 [99 S.Ct. at page 3027], that provisions in the "constitution of the general church" can override any right the majority of a local congregation might otherwise have to control the local church property.

Second, under California law, the "bylaws" of a religious corporation can include more than just a document bearing that title. We quote at length from *Korean*: "For religious nonprofit corporations, bylaws may partly be prescribed by, and may be an important tie to, a related superior or affiliated religious organization. The definition of the term 'bylaws' as used in the religious nonprofit corporation law includes 'the code or codes of rules *used*, adopted, or recognized for the regulation or management of the affairs of the corporation irrespective of the name or names by which such rules are designated.' (Corp. Code, § 9150, subd. (a).) One commentator described this provision of the religious nonprofit corporation law as follows: [¶] 'This approach in the Religious Corporation Law is designed specially to permit bylaws of a religious corporation to include other types of rules and regulations to be found in various religious documents such as canons, constitutions, or rules of other religious bodies; *church traditions* if sufficiently ascertainable; *rules of a religious superior*; and similar sources.' (1B Ballantine & Sterling, Cal. Corporation Law (4th ed. 1990) § 418.04, at pp. 19-493.)" (*Korean, supra*, 230 Cal.App.3d at pp. 503-504, italics added.)

Here, regardless of the fact that the Corporation never formally amended its bylaws or articles to reflect its inclusion in Antioch, and despite the fact the model constitution was never filled in, signed or returned to Metropolitan Philip, the evidence was unequivocal that the church and its leaders submitted to the authority of Metropolitan Philip. Although there was some testimony that some decisions were made without consulting Metropolitan Philip, there is substantial evidence that for approximately 11 years the rules that were in fact "used" or "recognized" for the "regulation or management of the affairs of the corporation" were the model constitution and all of the rules and canons of Antioch.

We conclude, therefore, that *Korean* cannot be meaningfully distinguished from this case and that the trial court was constitutionally prohibited from reaching a result other than the one it did.[8]

One other case bears brief mention. The Hardenbrook group cites *Presbytery of Riverside v. Community Church of Palm Springs* (1979) 89 Cal.App.3d 910 [152 Cal.Rptr. 854] for the proposition that if a local church's governing documents do not create an express trust, then the general church's determination that one faction represents the "true" church is "simply irrelevant."

---

[8]We see no reason to reach the other grounds relied on by the *Korean* court. Thus, we do not decide whether Antioch would have been entitled to the property in issue on an express trust theory had the entire congregation sought to leave.

*Riverside* does not support that proposition. To begin with, *Riverside* was a case where an entire congregation sought to leave the general church. The general church did attempt to appoint a new governing body for the local church, but it did so only *after* the local church had withdrawn from the general church, which it undisputedly had the right to do. (*Id.* at p. 924.) Thus, the general church's determination of who should lead the local church could not be binding because it already lost authority over the local church. Here, in contrast, the Hardenbrook group did not, and could not have, terminated the relationship with Antioch prior to the time Metropolitan Philip installed new leadership.

Finally, one procedural oddity remains. The operative complaint in Antioch's action names the Corporation as a defendant, and counsel for the Hardenbrook group has purported to represent the Corporation throughout this litigation. It is of no import that the Hardenbrook group or its counsel has purported to take actions on behalf of the Corporation. The majority faction in *Korean* likewise purported to act for the local church corporation but the court dismissed those actions as invalid. (*Korean, supra,* 230 Cal.App.3d at p. 505.)

What is more troubling is that neither Antioch nor the Washburn group plainly asserted the Washburn group's right to speak for the Corporation in the proceedings below. In *Korean,* in contrast, the general church specifically alleged that the seceding faction lacked authority to act on behalf of the local corporation. (*Korean, supra,* 230 Cal.App.3d at p. 488.) We conclude, however, that Antioch's failure to make a similar allegation here does not compel a different result. The general thrust of the complaint was clear enough and the Hardenbrook group was not prejudiced by the failure of Antioch and the Washburn group to articulate the parties' respective legal rights with precision. We can and shall disregard the incorrect alignment of the Corporation as a defendant just as the *Korean* court disregarded the fact that the suit before it had been brought in the name of the local corporation by people who lacked the authority to do so.

B.  *The cross-appeal\**

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

---

\*See footnote, *ante,* page 923.

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

Elia, J., and Mihara, J., concurred.