[No. A102858. First Dist., Div. Three. Aug. 30, 2005.]

CONCORD CHRISTIAN CENTER et al., Plaintiffs and Appellants, v. OPEN BIBLE STANDARD CHURCHES et al., Defendants and Respondents.

**COUNSEL**

Morgan Miller Blair, Richard C. Vasquez, Joshua D. Cohen, Kevin R. Brodehl; Law Office of Bryce C. Anderson and Bryce C. Anderson for Plaintiffs and Appellants.

Shapiro Buchman Provine & Patton, Jack C. Provine, Bruce A. McIntosh; Reed Smith, Kathleen M. Banke; and Mark Charles Bowman for Defendant and Respondent Pacific Region Open Bible Churches.

Cooksey Toolen Gage Duffy & Wong and Robert L. Toolen for Defendant and Respondent Open Bible Standard Churches.

**OPINION**

**McGUINESS, P. J.**—This case arises from the attempt in May 2001 by appellant Concord Christian Center (Concord Christian) and its pastor, appellant Rev. Lloyd Mashore (Mashore), to withdraw from their denominational affiliation with respondents Open Bible Standard Churches (Open Bible) and Pacific Region of Open Bible Standard Churches (Pacific Region). The appeal is from a judgment ruling that appellants' attempt to disaffiliate was ineffective, and upholding respondents' imposition of supervision and control over Concord Christian and all of its assets. Appellants contend: (1) the trial court erred in concluding that the "ecclesiastical rule" barred it from adjudicating the issues raised by appellants in their underlying lawsuit; and (2) under controlling neutral principles of civil law, the trial court erred in ruling that Concord Christian's attempt to disaffiliate from Open Bible was ineffective and invalid. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Open Bible: the National Church*

Open Bible was formed as a denomination in 1935. Its governing documents, contained in a publication entitled "Policies and Principles," include the denomination's constitution and bylaws, which are subject to amendment

and modification only by Open Bible's highest governing body, the biennial national convention attended by Open Bible-credentialed ministers and representatives from all member congregations. The church is administered through a system of national and regional officers and boards of directors, and is divided into five geographic regions. Of these, the Pacific Region is divided into six districts containing a total of approximately 125 churches in nine western states. The superintendent of each region serves as an officer of the national church and a member of the national board of directors, as well as chair of his or her regional board of directors, and is responsible for enforcement of the Open Bible Policies and Principles in that region. In turn, each district has a superintendent responsible for representing the national church and maintaining "regular contact with the ministers in that district." Disputes are appealed in writing successively to the district superintendent, the regional board, the administrative committee, and the national board.

Under the Open Bible Policies and Principles in effect at the time of Concord Christian's establishment (the 1949 Policies and Principles), the "[r]elationship" between an affiliated church and the national Open Bible association was described as one whereby "[b]y accepting a charter from [Open Bible], each [a]ffiliated [c]hurch agrees to become an integral part of the [Open Bible] Association and is bound by the Policy and Principles of the [Open Bible] Association." (1949 Policies and Principles, bylaws, art. III, § 1.) The Open Bible constitution as amended through June 1999 (1999 Constitution) similarly states that "[a]ffiliated churches shall be subject to the rules, regulations and discipline of Open Bible . . . , in accordance with the Policies and Principles of [Open Bible]." (1999 Const., art. IV, § 1.)

A local congregation affiliated with Open Bible is required to have articles of incorporation "in accordance with" those of the national church. (Open Bible bylaws, as amended through June 1999 (1999 Bylaws), art. IV, § 1, pars. 1–2.) Each affiliated local church has the "privilege" of adopting its own bylaws, so long as they "do not conflict with the spirit of the Policies and Principles" of Open Bible. (1999 Bylaws, art. IV, § 1, par. 3.) Under the 1999 Bylaws, if any affiliated church has not filed its own bylaws with the national, regional and district offices of the denomination, "all of the provisions of Article IV of [the Open Bible] bylaws shall apply." (1999 Bylaws, art. IV, § 1, par. 3.) Each affiliated church is required to "keep complete and accurate records in accordance with rules and regulations enacted by the [Open Bible] membership and the national board," and to make all of such records "open to the inspection of the national board or their representative." (1999 Bylaws, art. IV, § 1, par. 4.) With regard to property ownership, the 1999 Bylaws provide that "[n]o property of the [affiliated] church shall be sold, leased, mortgaged, or the title otherwise endangered without first obtaining written consent of its regional and district superintendent." (1999 Bylaws, art. IV, § 1, par. 5) When an affiliated member church is dissolved or becomes "extinct," its assets are

turned over to the applicable Open Bible region or to Open Bible's national offices in Iowa. (1999 Bylaws, art. IV, § 5, par. 5.)

The 1999 Bylaws require any individual member church desiring to withdraw from affiliation with Open Bible to follow a mandatory procedure. The decision to withdraw must be made at a special membership meeting, by a two-thirds vote of all active church members eligible to vote, with notice of the special meeting and of its intent publicly announced from the pulpit, posted on the church bulletin board, and sent by first class mail to the church membership. Notice of the special meeting must also be sent by registered mail to the national secretary of Open Bible at least 90 days prior to the date of the special meeting, with an invitation also extended and opportunity given to an Open Bible representative to "present the cause of" Open Bible at the meeting. (1999 Bylaws, art. IV, § 5, par. 2.)[1]

Any local affiliated church "needing or requesting help in the management of its pastoral, internal or legal affairs" may be placed under "regional supervision" for the purpose of providing "a service of counsel and supervision" aimed at assisting it "back to stability and health." (1999 Bylaws, art. V, § 1.) Specifically, regional supervision "may be authorized for any pastor or church that is not in order in relation to its authorized articles of incorporation, constitution and bylaws, or where there is valid evidence that the pastor or church is moving in that direction." An affiliated church "automatically" comes under regional supervision if it "has a pastor who is not a member in good standing of [Open Bible]." (1999 Bylaws, art. V, § 1 & subd. (c).) The 1999 Bylaws enumerate several other "emergency cases" in which regional supervision is authorized, including where "the regional board has to change . . . a pastor," "there is unresolved internal strife detrimental to the survival of the church," and "there are conflicts of interest, questionable legal and financial practices, or a pattern of numerical, financial or other decline." (1999 Bylaws, art. V, § 1, subds. (b), (d), (f).)

Under regional supervision, the regional board of directors becomes the governing board of the local affiliated church, with power to manage the local church's property and to remove the pastor. At the discretion of the regional board, an "advisory council" may be selected from the membership of the local church to assist "the acting pastor" in the routine day-to-day management of the church's affairs. (1999 Bylaws, art. V, § 4, pars. 1, 2, 6.)[2] No

---

[1] The 1949 Bylaws contained similar provisions regarding the withdrawal of affiliated local churches. (1949 Policies and Principles, bylaws, art. IV, § 33.)

[2] "A pastor may remain or be removed at the discretion of the regional board. The church board may be retained or dissolved by the regional board. When retained, the board shall serve as an advisory council to the regional board. [¶] When there is no continuing church board, an advisory council may be appointed by the regional board in consultation with the pastor, or

meetings of the advisory council, church board, church membership or congregation may be called or conducted without the prior authorization of the regional office, or conducted without the presence of a regional official. (1999 Bylaws, art. V, § 4, par. 4.) Regional supervision continues until the regional board is satisfied that the local church has met all the requirements for "Release." These include regular submission of monthly attendance and financial reports to the district and regional superintendents; complete cooperation with and participation in the "programs and Policies and Principles of Open Bible"; a successful "confirmation visit" by the district or regional superintendent "to review the items that were designated to be in order"; and successful functioning of the local congregation during a "mutually agreed period" of governance by a provisional board appointed by the regional superintendent. Upon release of a local church from regional supervision, the local congregation is restored to control over its local ministry and church assets. (1999 Bylaws, art. V, §§ 2, 5.)

### Concord Christian

Concord Christian was formed in 1953, and organized as a corporation "pursuant to Part 1, Division 2, Title 1 of the Corporation Code, or . . . the General Nonprofit Corporation Law of California."[3] Concord Christian's articles of incorporation affirmed that the "[b]y-laws of this corporation shall be in accord with the By-laws of the Open Bible Standard Churches, Inc., having its principal office in Des Moines, Iowa." On November 3, 1953, pursuant to its application for membership, Concord Christian was "accepted as an affiliated church of the Open Bible Standard Churches, Inc., Des Moines, Iowa in accordance with the Articles of Incorporation and By-laws thereof." In 1962, Concord Christian amended its articles of incorporation specifically to provide for the transfer of its corporate assets to Open Bible "in the event of the liquidation, dissolution, or abandonment" of Concord Christian. The church operated without its own bylaws for many years, instead following the provisions of article IV of Open Bible's denominational bylaws.

---

when no pastor is present, in consultation with members of the congregation in good standing. [¶] . . . [T]he advisory council shall take no official action without prior approval of the regional board. [¶] While the church is under regional supervision, the regional board shall serve in the place of and as the church board and the district superintendent shall serve as secretary of the church. Also, while there is no pastor, the regional superintendent shall serve as president of the church. In its capacity as the church board, the regional board shall have all powers that the church board would have in the absence of regional supervision." (1999 Bylaws, art. V, § 4, par. 2.)

[3] Concord Christian was called Open Bible Chapel of Concord until it changed to its current name in 1975. Throughout this opinion we will refer to Concord Christian by its present name.

Mashore became pastor of Concord Christian in 1973 as a credentialed Open Bible minister. On March 7, 1977, the board and membership voted unanimously to make him "the pastor of Concord Christian Center as a life-time commitment." In 1982, the church purchased approximately 10 acres (the Property) from the Mount Diablo Unified School District for a purchase price of $1.755 million. Acquisition of the Property was financed through sale of the previous church site and a five-year fundraising campaign to which over 500 people contributed. Although some of these funds came from outside sources, the majority was raised by means of substantial gifts from members and regular attendees of Concord Christian. By the time all encumbrances and mortgages were paid off in 1986, the total contributions to the purchase had reached $2.3 million, including interest. None of the funds used to purchase the Property came from Open Bible. Concord Christian used the Property to operate a private school called Kings Valley Christian School (the School). Ultimately, the School had an enrollment of approximately 500 students, annual revenues of $3 million, and an estimated value of $14 million.

As time passed, Mashore's leadership of Concord Christian became increasingly controversial. Between 1982 and 1994, the congregation declined from 216 to 91 members, and a schism developed as members took sides between Mashore and the assistant pastor. When the latter left in mid-October 1994, many members went with him. By that time, Mashore no longer had the support of the local church board. As a result of this dissension and attempts to remove him as pastor, Mashore himself asked Open Bible to impose regional supervision over Concord Christian on October 21, 1994. Pacific Region Superintendent Donald Bryan immediately placed Concord Christian "under official regional supervision" by letter stating that regional supervision would remain "in force until adequate steps are taken to be released." In accordance with Open Bible's procedures for regional supervision, the regional board of directors (Pacific Region Board) became the official board for Concord Christian, and Mashore was retained as pastor for day-to-day management of the local church.

On February 19, 1995, following several months of investigation and evaluations by national and regional representatives, Open Bible's Department of Church Development and Extension issued a report prescribing various "steps toward healing" Concord Christian's "very serious" and "dire" condition of "conflict" and division. Among other things, the report "unequivocally affirm[ed]" that Mashore should continue as senior pastor of Concord Christian. After this, more individuals left the congregation. By July 1995, the church membership had declined to 44.

Due to the continuing decline in its membership and ongoing controversies about its function and mission, regional supervision of Concord Christian

continued for five more years. A major source of contention was whether Concord Christian would continue as a church with regular Sunday services, or instead devote all of its attention to the operation of the School. Under Mashore's leadership, the church's focus increasingly became the School, to the point where its financial statements showed School tuition providing the bulk of its revenue, the School was officially identified as the "dba" of Concord Christian, and the names of the School and the church were used interchangeably in correspondence and other documents.

Another source of concern to the regional board was Mashore's attempted merger with a non-Open Bible congregation, Contra Costa County Harvest Church (Harvest Church), and its potential effect on Concord Christian's substantial assets. As the School became Concord Christian's primary focus, Harvest Church conducted the only Sunday services offered on the premises. The attempted merger failed due to personal friction between Harvest Church's pastor and Mashore, and the latter's demand that Harvest Church pay $3,500 in monthly salary to him and up to $20,000 in monthly expenses. After Harvest Church left the premises in 1998, Concord Christian's membership dropped to only 28 persons. There were no regular worship services held at Concord Christian thereafter.

Throughout this period, Mashore pressed for Concord Christian's release from regional supervision. Despite serious concerns on the part of some Pacific Region Board members about Mashore's lack of accountability for the management, control, and potential misuse of Concord Christian's assets and property, Concord Christian was released from regional supervision effective March 16, 2000. Upon release from supervision, Mashore reasserted his authority and consolidated control over Concord Christian's remaining membership with the ultimate goal of withdrawing from Open Bible. He had already taken steps in this direction by summarily terminating the membership of individual members of the congregation without the knowledge or approval of Open Bible. As a result of these actions, Concord Christian's membership dwindled to 19 individuals, all but five of whom were relatives of Mashore or of Marion Staton, his long-time secretary.

On March 16, 2001, the Concord Christian board—consisting of Mashore, his son Brad, his secretary Staton and two other members personally appointed by Mashore—voted to recommend to the congregation that it withdraw from its affiliation with Open Bible. The board also voted to place Barbara Neditch, the last member of Concord Christian not directly related to or closely allied with Mashore, on the inactive membership list. This act, which was done without Neditch's knowledge, left the total membership at

18 persons.[4] The record shows the decision to recommend withdrawal from Open Bible was based in part on Mashore's frustration with Open Bible's failure to support his goal of having his son Brad obtain ministerial credentials and succeed him as pastor at Concord Christian.

On May 7, 2001, nine of the remaining Concord Christian members voted to adopt new bylaws (the May 2001 Bylaws). In many material respects, these followed the pattern for all Open Bible affiliated local churches. Thus, they recited that Concord Christian was an affiliated member of Open Bible and Pacific Region, governed by the bylaws, Policies and Principles of the national denomination; that Concord Christian's property would pass to Pacific Region upon dissolution of the local church; and that eligibility for voting on withdrawal from Open Bible would be in accordance with the applicable provisions of the national Policies and Principles. On the other hand, the new bylaws also purported to appoint Mashore president of Concord Christian for life, and provided that all officers and board members would serve at his sole discretion. Concord Christian sent a copy of the newly adopted bylaws to Open Bible, as required by the Policies and Principles.

Concord Christian notified its remaining members that a special meeting would be held on May 23, 2001, at which one "[i]tem[] of business" would be the congregation's "relationship with Open Bible." Contrary to the specific requirements of Open Bible's 1999 Bylaws and the bylaws Concord Christian itself had just adopted, Concord Christian purposely gave no notice of this meeting to Open Bible's national, regional or district leadership. At the meeting, attended by 13 of Concord Christian's remaining 18 members, it was voted unanimously to terminate Concord Christian's affiliation with Open Bible and withdraw from the denomination.

Mashore sent a letter to Open Bible on May 29, 2001, notifying it for the first time of Concord Christian's withdrawal. By letter dated June 5, 2001, Open Bible informed Mashore that it did not recognize Concord Christian's "attempted withdrawal," noting that it was in conflict with the new May 2001 Bylaws Concord Christian had just adopted; and directed Concord Christian to revise the new bylaws to make them in harmony with the Policies and

---

[4] Significantly, under Open Bible's 1999 Bylaws, 18 eligible voting members is the minimum number required to elect a pastor in a local Open Bible affiliated church. If there are fewer than 18 such members, the regional board is "empowered, at its discretion, to appoint a pastor." (1999 Bylaws, art. IV, § 2, par. 4(E).)

We note the record shows that less than 4 percent of the funds raised between 1982 and 1986 to purchase Concord Christian's substantial real property assets had been contributed by the 18 remaining members loyal to Mashore. In contrast, several of the members who were forced out by Mashore—including Neditch and her husband—had donated substantial amounts of money over the years toward Concord Christian's purchase of the Property, and for other purposes.

Principles. On June 8, 2001, the Pacific Region Board adopted a resolution requesting suspension of Mashore's ministerial credentials pending further investigation, and reimposition of regional supervision over Concord Christian effective upon suspension of Mashore's credentials. After Open Bible's national board approved the regional board's request at its meeting of June 20, 2001, the Pacific Region superintendent advised Concord Christian of the reimposition of regional supervision by letter dated June 28, 2001.

Open Bible scheduled an investigative hearing to determine whether all members of Concord Christian had received notice of the meeting at which the withdrawal resolution had been adopted, and to decide the ultimate status of Mashore's ministerial credentials. The special hearing of the Pacific Region Board was held in Concord on July 16, 2001. Mashore attended with his attorney, but refused to answer any questions. The underlying lawsuit in this case—which Concord Christian had filed earlier in the day—was served on Open Bible and Pacific Region at the end of the hearing. On the same date, Mashore voluntarily surrendered his ministerial credentials in writing. Based on this hearing, the Pacific Region Board recommended that Mashore's Open Bible credentials be revoked. The Open Bible national board of credentials agreed, and so ordered.

On July 19, 2001, Concord Christian purported to adopt new articles of incorporation and bylaws deleting all references to any affiliation with Open Bible. Neither Concord Christian nor Mashore ever appealed the actions of the national Open Bible and Pacific Region Boards through the denominational appeals procedure set out in the Policies and Principles.

### The Litigation

Concord Christian's lawsuit sought declaratory and injunctive relief affirming its right to terminate its affiliation with Open Bible and withdraw from the denomination, and barring Open Bible from exercising authority or control over Concord Christian's corporation, property and assets. Open Bible and Pacific Region answered and filed cross-complaints against Concord Christian and Mashore, seeking a declaratory judgment that Concord Christian's attempt to withdraw was ineffective, and that Open Bible and Pacific Region had properly assumed control over Concord Christian pursuant to the procedures outlined in Open Bible's Policies and Principles. Both sides filed motions for summary judgment or adjudication. The trial court denied those filed by respondents, finding triable issues of material fact regarding the interpretation of the governing documents with respect to Open Bible's revocation of Mashore's credentials and imposition of regional supervision based on Concord Christian's attempt to disaffiliate; and it granted Concord Christian's motion for summary adjudication on respondents' claim to an express trust over Concord Christian's real property.

More than a year after filing suit, Mashore announced two "re-votes" on the question of withdrawal, on April 22 and June 28, 2002, with notice to Open Bible and an invitation to send a representative to attend and address Concord Christian's membership. Open Bible did not send any representative or observer, on the grounds that neither Mashore nor any of his supporters had authority to call such a meeting because Concord Christian had been under regional supervision since June 2001 and Mashore had long since been stripped of his Open Bible ministerial credentials. The fewer than 18 individuals who attended each of the two meetings called by Mashore again unanimously voted to withdraw from Open Bible.

The case was tried to the court sitting without a jury. On March 24, 2003, after eight days of testimony and admission of over 300 exhibits into evidence, the trial court issued a 26-page statement of decision finding that Open Bible was a hierarchical church of which Concord Christian was a subordinate member; Concord Christian's May 23, 2001, vote to disaffiliate from Open Bible was ineffective because Concord Christian had failed to comply with the procedural requirements set forth in both Open Bible's national governing documents and its own local bylaws; Open Bible's determination to suspend Mashore and revoke his ministerial credentials was an ecclesiastical determination not subject to review by civil courts; the imposition of regional supervision by Open Bible and Pacific Region was proper under the terms of Open Bible's governing documents, and was in any case an ecclesiastical matter not subject to civil court review; the Pacific Region Board was, and had been since June 15, 2001, the board of directors of Concord Christian; and all property and assets of Concord Christian were subject to the control and direction of the Pacific Region Board. Judgment was entered on May 7, 2003, and this appeal timely followed.

### STANDARD OF REVIEW

Appellants contend the issues on appeal are whether the trial court erred, first, by refusing to "adjudicat[e] most of the issues raised by Concord Christian" on the grounds of the ecclesiastical or hierarchical rule; and second, by finding, based on its application of contract law to "essential facts that are not in dispute," that Concord Christian could not terminate its affiliation with Open Bible. Based on this framing of the issues, appellants insist the trial court's judgment is subject to a de novo standard of review. In opposition, respondents argue that although some issues before us are essentially legal in nature, the bulk of the trial court's judgment was based on its determinations of disputed facts, and our review of the judgment must therefore be in accordance with the substantial evidence standard.

■ Respondents are correct. It is true, as appellants urge, that the trial court's determination to apply the ecclesiastical rule to certain issues is a

question of law reviewable de novo. (See *Singh v. Singh* (2004) 114 Cal.App.4th 1264, 1274–1281 [9 Cal.Rptr.3d 4]; *Metropolitan Philip v. Steiger* (2000) 82 Cal.App.4th 923, 928–932 [98 Cal.Rptr.2d 605]; *Barr v. United Methodist Church* (1979) 90 Cal.App.3d 259, 263–264, 273–276 [153 Cal.Rptr. 322].) However, the only matter as to which the trial court actually refused to make *any* finding based on the ecclesiastical rule was the legitimacy of Open Bible's determination to suspend and revoke Mashore's ministerial credentials. Although the trial court did state that respondents' imposition of regional supervision over Concord Christian was "a matter of ecclesiastical discipline," it also determined on the basis of the *factual* record that imposition of supervision "was proper under the terms of [Open Bible's] Policies and Procedures," did not create any "impermissible forfeiture," and was neither unconscionable nor a breach of the covenant of good faith and fair dealing. Based on the trial court's statement of decision and the findings set forth in the final judgment, we conclude that the trial court's application of the ecclesiastical rule presents mixed issues of law and fact. To the extent the trial court did apply the ecclesiastical rule, we must consider de novo whether it was correct in doing so as a matter of law. However, to the extent *that* determination was itself based on weighing disputed facts in the evidentiary record, our review must be on the basis of substantial evidence.

■ The other issue appellants raise—i.e., whether the trial court erred in concluding both that Concord Christian's attempt to disaffiliate from Open Bible was ineffective and that Pacific Region's imposition of regional supervision was proper—also presents mixed issues of law and fact. To the extent our determination of this question depends on the judicial interpretation of the articles of incorporation, bylaws, and other governing documents of Open Bible and Concord Christian, we must apply neutral principles of law de novo. (*Presbyterian Church v. Hull Church* (1969) 393 U.S. 440, 449 [21 L.Ed.2d 658, 89 S.Ct. 601]; *Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik* (2004) 118 Cal.App.4th 919, 930 [13 Cal.Rptr.3d 552]; *Protestant Episcopal Church v. Barker* (1981) 115 Cal.App.3d 599, 621 [171 Cal.Rptr. 541] (*Barker*).) However, the application of these governing documents to the circumstances presented depends on an analysis of the evidence adduced below, which—contrary to appellants' assertion—is *not* "largely undisputed." Both the lengthy factual presentations in the parties' appellate briefs and the trial court's denial of summary judgment and summary adjudication based on the existence of numerous triable issues of fact demonstrate that most of the material facts in this case are very much in dispute. To that extent, therefore, our review of the central issue in this appeal is subject to the well-established standard applicable to any claim that a judgment or finding is not supported by the evidence in the record. ■ Under that standard, we must consider all the evidence in the light most

favorable to the prevailing parties, giving them the benefit of every reasonable inference, and resolving conflicts in support of the judgment. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630–631 [85 Cal.Rptr.2d 386]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 359–364, pp. 408–415.)

APPLICABILITY OF ECCLESIASTICAL RULE OF JUDICIAL DEFERENCE

■ The First and Fourteenth Amendments of the federal Constitution— and their counterpart in the California Constitution (Cal. Const., art. I, § 4)—impose limitations on the jurisdiction of civil courts over the internal affairs and administration of ecclesiastical institutions. The scope of these limitations depends on a number of factors, including whether a given church is hierarchical or congregational and the nature of the specific matters in dispute in a given case. Generally, civil jurisdiction is more limited with respect to hierarchical religious organizations than it is in the case of congregational or independent ones. (*Watson v. Jones* (1871) 80 U.S. 679, 722–727 [20 L.Ed. 666]; *Rosicrucian Fellow. v. Rosicrucian Etc. Ch.* (1952) 39 Cal.2d 121, 131–133 [245 P.2d 481] (*Rosicrucian*).) Appellants contend that the trial court erred in this case both by finding that Open Bible is a hierarchical church, and by relying on the ecclesiastical rule of judicial deference to decline to adjudicate a number of key issues. Appellants are wrong on both counts.

■ By definition, a hierarchical church is one in which individual churches are "organized as a body with other churches having similar faith and doctrine[, and] with a common ruling convocation or ecclesiastical head" vested with ultimate ecclesiastical authority over the individual congregations and members of the entire organized church. (*Kedroff v. St. Nicholas Cathedral* (1952) 344 U.S. 94, 110 & fn. 15 [97 L.Ed. 120, 73 S.Ct. 143]; see *Watson v. Jones, supra,* 80 U.S. at pp. 722–723.) It has long been established that in such a hierarchical church, an individual local congregation that affiliates with the national church body becomes "a member of a much larger and more important religious organization, . . . under its government and control, and . . . bound by its orders and judgments." (*Watson v. Jones, supra,* 80 U.S. at pp. 726–727; see *Committee of Missions v. Pacific Synod* (1909) 157 Cal. 105, 128 [106 P. 395]; *Wheelock v. First Presb. Church* (1897) 119 Cal. 477, 485 [51 P. 841].) In contrast, a congregational church is defined as one "strictly independent of other ecclesiastical associations, and [one that] so far as church government is concerned, owes no fealty or obligation to any higher authority." (*Watson v. Jones, supra,* 80 U.S. at p. 722.)

The first issue addressed by the trial court in this case was whether Open Bible is a hierarchical or a congregational church. As the court noted, the issue was "vigorously dispute[d]" below, and both sides "presented substantial testimony and argument" thereon. Based on the evidence of Open Bible's

history, governing documents and structure, the trial court determined that Open Bible is a hierarchical church of which Concord Christian is a subordinate member. The trial court's determination is supported both by the applicable law and by substantial evidence.

Open Bible's constitution and bylaws establish a large, interconnected structure of national, regional and district administration, containing a system of church tribunals and appeals for the enforcement of the Policies and Principles and the resolution of intrachurch disputes. (1999 Bylaws, art. IV, § 1, pars. 3–6.) In this structure, an individual affiliated church is treated as an "integral part" of Open Bible (1949 Policies and Principles, bylaws, art. III, § 1), "subject to the rules, regulations and discipline" of the national church and its regional administrative bodies. (1999 Const., art. IV, § 1.) A local congregation may adopt its own bylaws, but only if they are not in conflict with Open Bible's national Policies and Principles.

The governing documents of both Open Bible and Concord Christian show that from the time of the latter's inception and affiliation with Open Bible in 1953 through the adoption of its new bylaws in May 2001, Concord Christian has consistently and explicitly been identified as a subordinate member church in the Open Bible structure. Concord Christian's own articles of incorporation and bylaws expressly state that it is an affiliated member church of Open Bible, governed by and organized in accordance with the constitution and bylaws of Open Bible. Its bylaws contain an express provision for the reversion of its property to Open Bible in the event of Concord Christian's dissolution. Like all affiliated churches of Open Bible, in order to be valid, Concord Christian's bylaws were required to be consistent with those of the national church, and to be filed with the latter. It thus meets the specific criteria of a subordinate nonprofit religious corporation, as set out in section 9132 of the Corporations Code.[5]

Aside from the explicit acknowledgments of Concord Christian's subordinate position in its own governing documents, the actions of the parties confirm the hierarchical nature of the Open Bible polity. Thus, Mashore's own request that Pacific Region place Concord Christian under regional supervision in 1994 constituted an explicit recognition of Concord Christian's subordinate position in Open Bible's hierarchy. In addition, every Open Bible

---

[5] Corporations Code section 9132 provides in pertinent part as follows: "(a) The articles of incorporation may set forth any or all of the following provisions, which shall not be effective unless expressly provided in the articles: [¶] . . . [¶]

"(2) In the case of a subordinate corporation instituted or created under the authority of a head organization, a provision setting forth either or both of the following: [¶] . . . [¶]

"(ii) That in the event of its dissolution . . . for any reason, any assets of the corporation . . . shall be distributed to the head organization."

minister is required annually to verify his good standing and pledge continued support for the Policies and Principles of Open Bible to maintain his or her ministerial credentials. (1999 Bylaws, art. VI, § 1, par. 5(B).) The record shows that Mashore complied with the requirement until approximately December 2000.

Based on this record, it cannot be said that at any point in its history Concord Christian was a "strictly independent" congregational church, free of outside ecclesiastical associations and owing no allegiance or obligation to any higher authority. (*Watson v. Jones, supra,* 80 U.S. at p. 722.) We therefore conclude the trial court's determination that Open Bible is a hierarchical church of which Concord Christian is a subordinate member was supported by substantial evidence in the record.

Appellants nevertheless urge that even if Open Bible is a hierarchical religious organization, the ecclesiastical rule is relevant only to church disputes centered on religious *doctrine*, and not to issues relating to possession and control of property and assets such as were presented in this case. To the extent this distinction is material to this appeal, appellants are incorrect.

The United States Supreme Court has adopted a two-pronged analysis in intrachurch disputes involving property. Civil courts may employ " 'neutral principles of law, developed for use in all property disputes,' " as the basis for resolving such disputes, *unless* this determination depends on the resolution of an ecclesiastical controversy over religious doctrine, practice or polity. (*Jones v. Wolf* (1979) 443 U.S. 595, 599, 602–604 [61 L.Ed.2d 775, 99 S.Ct. 3020]; *Presbyterian Church v. Hull Church, supra,* 393 U.S. at p. 449.) Difficulties arise when application of the neutral principles approach to a particular dispute requires a civil court to examine the governing documents of a religious organization, such as a church constitution, articles of incorporation, bylaws or instruments of property ownership. To the extent the interpretation or construction of these documents involves the resolution of a matter of ecclesiastical doctrine, polity or administration, the civil court must defer to the resolution of the issue by the "authoritative ecclesiastical body." (*Jones v. Wolf, supra,* 443 U.S. at pp. 602–606.) Significantly, such ecclesiastical matters include not only issues of religious doctrine per se, but also issues of membership, clergy credentials and discipline, and church polity and administration. (*Id.* at pp. 602, 604–605, 608–609; see also *Serbian Orthodox Diocese v. Milivojevich* (1976) 426 U.S. 696, 709, 724 [49 L.Ed.2d 151, 96 S.Ct. 2372]; *Metropolitan Philip v. Steiger, supra,* 82 Cal.App.4th at pp. 930–931; *Korean United Presbyterian Church v. Presbytery of the Pacific* (1991) 230 Cal.App.3d 480, 498–503 [281 Cal.Rptr. 396], disapproved on other grounds in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11 [29 Cal.Rptr.2d 804, 872 P.2d 143].)

█ California courts apply the neutral principles of law approach, taking care in resolving church property disputes not to make determinations of underlying controversies over religious doctrine and polity. (*Rosicrucian, supra,* 39 Cal.2d at pp. 131–133; *Singh v. Singh, supra,* 114 Cal.App.4th at p. 1281; *Korean United Presbyterian Church v. Presbytery of the Pacific, supra,* 230 Cal.App.3d at pp. 498, 500–503.) Accordingly, even where the matter at issue in a church dispute involves questions of ownership of property and assets, civil courts applying neutral principles of law must defer to the authoritative decisions of hierarchical ecclesiastical bodies on any matters of internal church polity necessarily involved in resolving the issue. (*Metropolitan Philip v. Steiger, supra,* 82 Cal.App.4th at pp. 930–932; *Korean United Presbyterian Church v. Presbytery of the Pacific, supra,* 230 Cal.App.3d at pp. 498–503; cf. *Singh v. Singh, supra,* 114 Cal.App.4th at pp. 1281–1282.)

As the trial court correctly determined, this case does not involve any issues of actual title to or ownership of property. It is undisputed that legal title to the Property, including that used by appellants for purposes of the School, is held in the corporate name of Concord Christian. Respondents have never claimed that *title* to this Property should pass to them, and any claim it was held by Concord Christian in trust for respondents has been conclusively resolved in favor of Concord Christian by summary adjudication. (Cf. *Barker, supra,* 115 Cal.App.3d at pp. 615.)[6] That determination was not appealed, and is not before us.

On the other hand, because the issues before the trial court affected the ultimate *control* of Concord Christian's property and assets, the trial court

---

[6] Appellants place great reliance on *Barker, supra,* 115 Cal.App.3d 599. There, the issue was whether four churches that had seceded from their affiliation with a national church lost their *title* to real property held in their names. (*Id.* at p. 604.) The plaintiff national church argued that the local churches held their property in trust for the general church. (*Id.* at pp. 605–606.) Applying neutral principles of law, the appellate court concluded that three of the churches held their property in their own names without any trust, express or implied, in favor of the national or regional church; but that the fourth church did hold its property in trust for the diocese, because it had been incorporated after the adoption of a diocesan canon providing that upon dissolution of a church its property would revert to the diocese. (*Id.* at pp. 625–626.)

*Barker* is distinguishable on both the facts and the law. In this case, respondents make no claim to *title* in Concord Christian's property or assets; the issue is whether Open Bible properly suspended Mashore and imposed regional supervision upon Concord Christian's failed attempt at disaffiliation. In *Barker,* unlike this case, there was neither allegation nor evidence that the withdrawal of the individual local churches from the national church had been ineffective or invalid, or in violation of governing bylaws and articles of incorporation. Nor were regional supervision procedures, clergy discipline, ministerial qualifications, or congregational schism at issue with regard to any of the local churches. In short, *Barker*'s holding—that an express trust is required for a national church to retain title to the property of a seceding subordinate church—is simply not relevant to the facts of this case, or the issues presented on this appeal.

properly ruled that it had jurisdiction to adjudicate these issues "to the extent [it could] do so without impinging on exclusive ecclesiastical authority." In both its extensive statement of decision and the judgment entered thereon, the trial court carefully separated its own determinations based on substantial evidence from those in which it deferred, on ecclesiastical grounds, to the decisions of respondents Open Bible and Pacific Region. The two issues as to which the trial court made reference to the ecclesiastical rule—i.e., the legitimacy of Open Bible's suspension of Mashore and revocation of his ministerial credentials, and the propriety of its imposition of regional supervision as a matter of ecclesiastical polity—are precisely the kinds of issues to which both the United States Supreme Court and the courts of this state have traditionally applied the ecclesiastical rule of judicial deference. (*Serbian Orthodox Diocese v. Milivojevich, supra,* 426 U.S. at pp. 709, 724; *Metropolitan Philip v. Steiger, supra,* 82 Cal.App.4th at pp. 930–931; *Korean United Presbyterian Church v. Presbytery of the Pacific, supra,* 230 Cal.App.3d at pp. 498–503) The trial court went on to find that respondents' imposition of regional supervision was proper as a matter of law based on the applicable provisions of the controlling documents of both Open Bible and Concord Christian and the substantial evidence in the record; and it applied neutral principles of contract and corporations law to all the other issues presented.

Thus, we conclude the trial court correctly determined that Open Bible was a hierarchical church as to which a civil court must defer with respect to its ecclesiastical decisions. Having found the ecclesiastical rule appropriate to the circumstances, the trial court appropriately applied it to abstain from making a determination as to only one issue: namely, the propriety of Open Bible's revocation of Mashore's ministerial credentials. The trial court made its ultimate determinations—that Concord Christian's attempt to disaffiliate from Open Bible had failed, and that the former was therefore subject to Open Bible's regional supervision and control—by weighing the evidence adduced at trial in the light of neutral principles of civil law, without reference to the ecclesiastical rule.

### RESOLUTION OF ISSUES SUBJECT TO NEUTRAL PRINCIPLES OF CIVIL LAW

We turn then to the trial court's application of neutral principles of civil law to the nonecclesiastical issues adjudicated below. The record shows that the trial court determined all other issues raised in appellants' complaint—specifically including whether regional supervision was supported as a matter of law by the terms of the parties' governing documents and the factual circumstances of the case—on the basis of the substantial evidence in the record and neutral principles of civil law. Each of the trial court's determinations was supported by substantial evidence.

*Attempted Withdrawal from Open Bible*

We have already discussed the first such issue addressed by the trial court, and have concluded its determination that Open Bible is a hierarchical church rather than a congregational one was supported by substantial evidence. The critical factual issue flowing from that determination was whether Concord Christian's attempted withdrawal from its affiliation with Open Bible was effective. The trial court's finding that it was not is fully supported by the record.

It is *undisputed* that by not giving Open Bible 90 days' notice of the meeting at which the withdrawal motion would be put to a vote, or offering an opportunity for Open Bible to send a representative to attend that meeting and address the congregation prior to any vote, Concord Christian failed to comply with Open Bible's procedural requirements for a local affiliate church seeking to initiate a withdrawal of affiliation. (1999 Bylaws, art. IV, § 5, par. 2.) Concord Christian asserts that under its newly adopted bylaws of May 7, 2001, compliance with Open Bible's notice requirements was unnecessary; and in any event, such compliance would have been futile because Open Bible had no substantive ability under its Policies and Principles to effectively veto a local congregation's decision to withdraw.

One difficulty with Concord Christian's position is that its own May 2001 Bylaws had not been approved by Open Bible at the time the vote to withdraw was held on May 23, 2001. Under Open Bible's Policies and Principles, these local bylaws were ineffective to the extent they were inconsistent with Open Bible's constitution and bylaws. Moreover, and as pointed out by Open Bible in rejecting the withdrawal vote, the May 2001 Bylaws themselves expressly stated that Concord Christian "shall be governed by" the bylaws, Policies and Principles of the national denomination. (May 2001 Bylaws, art. III.) In addition, the May 2001 Bylaws specifically cited the applicable provisions in article IV, Section 5, paragraph 2 of Open Bible's 1999 Bylaws with reference to the rules for eligibility to vote on church withdrawal, with the evident purpose of bringing Concord Christian's procedures into conformity with those set out in the Policies and Principles. (May 2001 Bylaws, art. VI, § 1, par. D.) In view of this, and their explicit subordination of Concord Christian to the national Policies and Principles of Open Bible, Concord Christian's May 2001 Bylaws may reasonably be construed as adopting the procedures set forth in Open Bible's 1999 Bylaws for withdrawal from Open Bible affiliation.

██ Thus, even if we assume that the May 2001 Bylaws *were* operative despite Concord Christian's failure to obtain Open Bible's prior approval thereof, under neutral principles of civil law Concord Christian's failure to

give any notice to Open Bible or the Pacific Region before the withdrawal vote rendered that vote ineffective under *both* Open Bible's national bylaws, and the recently adopted May 2001 Bylaws of Concord Christian itself. The trial court's determination to this effect was both supported by the record and correct as a matter of law. (*Singh v. Singh, supra,* 114 Cal.App.4th at pp. 1281–1286, 1293–1295, 9 Cal.Rptr.3d 4 [court had jurisdiction to rule on propriety of election for board of directors of religious body under applicable bylaws of the organization].)

### Imposition of Regional Supervision

The next issue addressed by the trial court was whether respondents properly imposed regional supervision on Concord Christian in June 2001, thereby rendering ineffective appellants' subsequent attempts to effectuate withdrawal in two ratifying votes in April and June 2002, both undertaken with prior notice to Open Bible. The parties have sharply contested this issue. In the course of the trial, they offered conflicting testimony and evidence regarding respondents' good faith in imposing various requirements upon Concord Christian during the first lengthy period of regional supervision, and in subsequently moving to suspend Mashore and reimpose supervision after the withdrawal vote of May 23, 2001. The trial court determined that regional supervision was properly imposed. We need not review the applicability of the ecclesiastical rule to this issue, because the trial court itself assumed it was able to adjudicate the claim on the basis of the evidence.

Its determination was fully supported by the record. The evidence shows that respondents' imposition of regional supervision was based on a number of factors, including Concord Christian's emphasis on the operation of the School to the exclusion of regularly scheduled congregational worship services; the attempts at merger with an outside, non-Open Bible congregation; ongoing controversy over Mashore's leadership style and activities; chronic congregational disunity and schism; the precipitous decline in Concord Christian's membership; and finally, Mashore's actions in calling a meeting of hand-picked members for the purpose of withdrawing Concord Christian from Open Bible without any prior notice to respondents. Each of these circumstances justified imposition of regional supervision in accordance with the applicable provisions of Open Bible's Policies and Principles. (1999 Bylaws, art. V, § 1, subds. (b), (d), (f).) In addition, the fact Mashore himself voluntarily relinquished his ministerial credentials *before* Open Bible imposed regional supervision was by itself sufficient to justify *automatic* imposition of regional supervision under the 1999 Bylaws. (1999 Bylaws, art. IV, § 2, par. 1; *id.,* art. V, § 1, subd. (c).)

Based on this record, there was ample evidence to support the trial court's determination that respondents had properly imposed regional supervision,

independent of the impact on this decision of the ecclesiastical rule of judicial deference. Similarly, the trial court was correct in making its ultimate determination that by virtue of its proper imposition of regional supervision, the Pacific Region Board had legally become the board of directors of Concord Christian, with control and direction over all the property and assets thereof. In consequence, the trial court did not err in finding ineffective Concord Christian's attempts to cure the first defective withdrawal vote by noticing two subsequent ratifying votes after supervision had already been imposed. Quite clearly, these were actions the former Concord Christian board no longer had any authority or power to undertake once the Pacific Region Board had replaced it and suspended Mashore from his ministry and his position at Concord Christian.

### Other Claims for Equitable Relief

Finally, appellants contend that by finding appellants' vote to withdraw from Open Bible procedurally ineffective, the trial court gave respondents a discretionary "veto" over any local affiliated church's attempt to disaffiliate. Appellants urge that under neutral principles of law, the trial court should have fashioned a remedy that preserved appellants' "expectation interest" and substantive right to withdraw from its affiliation. As possible remedies to be awarded respondents, appellants suggest either unspecified "damages for breach," or a court-ordered "re-vote" under Corporations Code section 9414. In addition, appellants argue the trial court erred by not considering appellants' claims that respondents' actions were unconscionable, in breach of the covenant of good faith and fair dealing, and unenforceable as effectuating an impermissible forfeiture. The contentions are meritless.

Appellants' argument on remedy ignores the crucial role of the *facts* in this case. Contrary to appellants' assertion, there is nothing in the Policies and Principles giving affiliated local churches an unfettered right to withdraw from affiliation at will. The very first of the specific and clearly mandatory requirements for withdrawal set out in the 1999 Bylaws is that "notice" be given to *both* the local membership *and* Open Bible itself a full 90 days prior to the date of the "special meeting" at which withdrawal is to be voted upon. (1999 Bylaws, art. IV, § 5, par. 2.) Because the vote to withdraw in this case was taken without *any* notice to Open Bible, it was in clear violation of this mandatory requirement. Indeed, the record shows that Mashore *intentionally* concealed from respondents both the fact of the meeting and the nature of the vote to be taken, and that he did so in knowing violation of the requirements for withdrawal set out in Open Bible's Policies and Principles, in order to avoid any objections or by interference from respondents.

This was more than a technical procedural error on appellants' part. They were not entitled, simply by majority vote at an unnoticed meeting of the handpicked membership, to override the mandatory provisions for withdrawal found in the national church's constitution and bylaws, to which appellants' own bylaws expressly stated their subordination. (See *Guardian Angel Polish Nat. Catholic Church of L.A. v. Grotnik, supra,* 118 Cal.App.4th at pp. 929–930.) Nor, on the facts of this case, were appellants entitled simply to a "re-vote" of the matter with proper notice given to Open Bible. As the record shows, no effective vote to withdraw was taken before Mashore voluntarily surrendered his ministerial credentials to Open Bible, triggering *automatic* imposition of regional supervision under the Policies and Principles. On these facts, the trial court correctly declined to adopt the remedies suggested by appellants, finding instead that respondents had properly imposed regional supervision after Concord Christian's inoperative vote to disaffiliate.

Nor is there merit to appellants' contention that the trial court erroneously failed to consider their claims of unconscionability, breach of the covenant of good faith and fair dealing, and forfeiture. As the trial court's well thought-out statement of decision makes clear, each of these claims was in fact addressed, and found "unconvincing." Based on our review of the record, we agree with the trial court. Appellants' assertions of unconscionability and forfeiture depend upon their theory that respondents' actions have deprived appellants of their property and assets. As seen, the trial court's ruling does not, and indeed could not purport to change the title to Concord Christian's property and assets in favor of respondents. Instead, it confirms that the property and assets of Concord Christian remain in *its* possession; only the "control and direction" over those assets has been acquired by the Pacific Region Board and superintendent by virtue of the imposition of regional supervision over Concord Christian and consequent replacement of the local board and officers appointed by Mashore.

Contrary to appellants' assertions on this appeal, the trial court also considered appellants' claim of breach of the covenant of good faith and fair dealing. Citing the substantial evidence in support of the charges leveled by respondents against Mashore and his stewardship of Concord Christian, the trial court concluded those charges were not contrived, lacking in foundation, or the result of "conspiratorial conduct or evil intent," and were brought in good faith. Based on our own review of the record, we agree with the trial court. There was no error.

### DISPOSITION

The judgment is affirmed. Appellants shall pay respondents' costs on appeal.

Corrigan, J., and Pollak, J., concurred.

A petition for a rehearing was denied October 21, 2005, and appellants' petition for review by the Supreme Court was denied December 14, 2005.