[No. B203800. Second Dist., Div. Seven. Apr. 27, 2009.]

IGLESIA EVANGELICA LATINA, INC., et al., Plaintiffs and Appellants, v. SOUTHERN PACIFIC LATIN AMERICAN DISTRICT OF THE ASSEMBLIES OF GOD et al., Defendants and Respondents.

SOUTHERN PACIFIC LATIN AMERICAN DISTRICT OF THE ASSEMBLIES OF GOD et al., Plaintiffs and Respondents, v. JUAN A. REYES, Defendant and Appellant.

SOUTHERN PACIFIC LATIN AMERICAN DISTRICT OF THE ASSEMBLIES OF GOD, Plaintiff and Respondent, v. JUAN A. REYES, Defendant and Appellant.

422

**COUNSEL**

Payne & Fears, Eric C. Sohlgren and Daniel F. Lula for Plaintiffs and Appellants and for Defendant and Appellant.

Collins & Bellenghi, Michael J. Collins and Julian B. Bellenghi for Defendants and Respondents and for Plaintiffs and Respondents.

## OPINION

**ZELON, J.**—Appellants Juan A. Reyes and Iglesia Evangelica Latina, Inc. (IEL), appeal the trial court's judgment in favor of Southern Pacific Latin American District of the Assemblies of God (SPLAD) on three consolidated actions arising out of SPLAD's takeover of IEL after an internal dispute at IEL and SPLAD's transfer of IEL's real property. Appellants contend that although IEL was affiliated with the national hierarchical church Assemblies of God, of which SPLAD was an intermediate governing body, SPLAD had no authority to take over its corporate governance and transfer its property to itself. We reverse the trial court's judgment and hold in favor of IEL on SPLAD's claims as well as IEL's claims arising from the wrongful transfer of its property to SPLAD, and remand for a new trial on IEL's remaining claims.

## FACTUAL BACKGROUND AND
## PROCEDURAL HISTORY

■ The First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice, and requires civil courts to defer issues of religious doctrine or polity to the highest court of a hierarchical church organization. While state secular courts may resolve church property disputes according to each state's law, the method chosen must not violate the First Amendment. In *Episcopal Church Cases* (2009) 45 Cal.4th 467 [87 Cal.Rptr.3d 275, 198 P.3d 66], our state Supreme Court held that we must apply the "neutral principles" approach to resolving church property disputes in a hierarchical church organization.

The Assemblies of God church is a hierarchical church. Within this hierarchy are three levels: The General Council of the Assemblies of God sits at the peak of the hierarchy; below this are district councils that supervise specific geographic areas; on the third level are two types of churches—district council churches and general council churches. SPLAD is one of the intermediate-level district councils which covers portions of California, Nevada, Hawaii and Arizona; region V of SPLAD supervises Los Angeles. (SPLAD Const., art. V, § 4(c).) At the base of the hierarchy, the general council churches have their own boards and operate independently, while district council churches are subject to direct control by their district councils.[1] (SPLAD Bylaws, art. VII, §§ 1, 2, 10.)

---

[1] Sergio Navarette, the Superintendent of SPLAD, testified at trial that a church must first become a district council church before it can become a general council church; a general council church is a mature church that is sovereign and self-governing. As discussed *ante*, the names reflect the immediate supervisorial body of the local church: either the General Council of the Assemblies of God, or one of the district councils, such as SPLAD.

IEL incorporated in July 1975 as an independent church; in September 1979, IEL affiliated with SPLAD as a district council church; and in 2002, IEL affiliated with the national organization of Assemblies of God as a general council church. In December 2005, as a result of a dispute between IEL's pastors, SPLAD removed the pastors, converted IEL from a general council church to a district council church, and had IEL transfer to SPLAD 16 parcels of real property held by IEL. On April 23, 2006, members of IEL returned and took over the church, expelling SPLAD's interim pastor. Three separate legal actions resulted from these events: (1) IEL's action to recover its real property and other claims; (2) SPLAD's action against IEL's members for ejectment from the church property and quiet title; (3) SPLAD's action against IEL's members for forcible detainer.

1. *The Parties' Governing Documents and Structure of Assemblies of God.*

To effectuate its hierarchical structure, the Assemblies of God church uses four different constitutions: (1) the superior authority, which is the constitution of the General Council of the Assemblies of God; (2) the district council constitution (in this case, SPLAD), and below that either (3) a district church's constitution, or (4) a general council church's constitution, each of which must be in accord with the two superior constitutions.

Assemblies of God's Constitution states that the "General Council of the Assemblies of God is a cooperative fellowship based upon mutual agreements voluntarily entered into by its membership." (The General Council of the Assemblies of God (AOG) Const., art. II.) Assemblies of God is organized around an executive presbytery and a general presbytery. (AOG Const., art. IX, §§ 2, 3.) The AOG Constitution provides for district councils, which "shall have supervision over all the ecclesial and sacerdotal activities of the Assemblies of God in its prescribed field . . . ." (AOG Const., art. X, § 2.) Further, the AOG Constitution prohibits the district councils from violating the constitution or bylaws of the AOG, and "In the prosecution of its work the district council shall keep vigilant watch against any violation of the principles of spiritual unity and cooperative fellowship to which the Assemblies of God Fellowship is unalterably dedicated." (AOG Const., art. X, § 6.)

With respect to the subordinate churches, Assemblies of God directs general council churches to adopt corporate documents compatible with those of Assemblies of God. (AOG Const., art. XI, § 1(a)(4).) "Each General Council affiliated assembly has the right of self-government under Jesus Christ, its living Head, and shall have the power to choose or call its pastor, elect its official board, and transact all other business pertaining to its life as a local unit. . . . The fact it is affiliated with The General Council of the

Assemblies of God shall in no way destroy its rights . . . or interfere with its sovereignty." (AOG Const., art. XI, § 1(c).) District council churches are "under the supervision of the district council, in accordance with the provisions of the district council constitution and bylaws." (AOG Const., art. XI, § 2.) Assemblies of God encourages such local assemblies to achieve general council status, and the executive presbytery of SPLAD has the exclusive power to determine when "a local church has reached a state of growth, stability and maturity qualifying it for affiliation with the General Council of the Assemblies of God as a sovereign local church." (SPLAD Bylaws, art. VII, § 2(e).)

At the intermediate level, SPLAD's constitution provides that its directive is to "promote and maintain standards of doctrine and conduct, and to apply discipline according to the Holy Scripture and this Constitution and By-laws. . . ." (SPLAD Const., art. III, § 1.) SPLAD is also governed by executive presbytery and district presbytery. (SPLAD Const., arts. VII, VIII.) SPLAD's constitution provides that it is subordinate to Assemblies of God. "This District Council hereby adopts and acknowledges as superior authority the Constitution and Bylaws of The General Council of the Assemblies of God, as such is now or may from time to time be amended, hereinafter for simplicity occasionally referred to as 'General Council Bylaws,' for conduct of all business and administration . . . and establishment of standards of doctrine and conduct, and this corporation is likewise subject to legislation and directives of that parent organization." (SPLAD Const., art. IV, § 2.)

With respect to local churches, SPLAD's bylaws provide that "District sponsored local churches shall be recognized as District Council affiliated churches, under supervision of the District Council bylaws. District Council affiliated programs may include . . . former sovereign Assemblies of God churches that have surrendered their sovereignty temporarily or otherwise that seek District Council assistance. . . ." (SPLAD Bylaws, art. VIII, § 10(a).) SPLAD's bylaws provide it may remove from the roster any district council church which ceases to qualify for recognition, and likewise may request "sovereign" churches that are disapproved be removed from the roster. (SPLAD Bylaws, art. V, § 5(b)(2).) SPLAD has the exclusive authority to resolve disputes between factions of a church and the church board. (SPLAD Bylaws, art. XVI, § 2(b).) "When in need of counsel and advice in administrative or other matters, the local sovereign church may appeal to the District Officers." (SPLAD Bylaws, art. VII, § 8.)

IEL's Articles of Incorporation filed in 1975 provide that its purpose is to establish and operate a church for the worship of Jesus Christ and to proclaim and spread the good news of salvation by faith in Jesus Christ. (IEL Articles of Incorporation, art. II, § (A)(1).) IEL's articles give it the power to, among

other things, hold and invest money and property; sell and convert property; and purchase or encumber property. The articles provide that "Upon the dissolution or winding up of the corporation, its assets remaining after payment or provision for payment of all debts and liabilities of this corporation, shall be distributed to a non-profit fund, foundation, or corporation which is organized and operated exclusively for charitable purposes and which has established its tax exempt status under Section 501 (c)(3) of the Internal Revenue Code." (IEL Articles of Incorporation, art. VI.) With respect to any assets held in trust, such trust assets must be disposed of pursuant to court order upon petition by the Attorney General or any other person in a proceeding to which the Attorney General is a party. The Articles of Incorporation contain no other provisions for the disposition of IEL's property. (IEL Articles of Incorporation, art. VI.)

At the local level, IEL's constitution and bylaws, adopted May 21, 1990, provide that it is affiliated with the AOG. (IEL Const., art. II.) The board consists of five members, and IEL's board represents the legal entity of the church in the State of California, while the board of deacons represents the "spiritual life and service" of the church. The board conducts the activities and affairs of the corporation, functions as an interface with the secular community, oversees church finances, employs a secular accountant, and is responsible for processing all documents regarding the purchase and sale of real property. (IEL Const., art. 6; IEL Bylaws, art. 3, §§ 1, 2.) The bylaws empower the board to execute any instruments or contracts on behalf of the corporation. (IEL Bylaws, art. 6, § 1.)

### 2. *The Events Preceding the Litigation.*

Until December 15, 2005, IEL was a general council church affiliated with Assemblies of God, operating with its own constitution and bylaws. IEL had an elected five-member board, consisting of Moises Sandoval, Juan Reyes, Misael Portillo, William Ruiz, and Ernesto Ramirez. Moises Sandoval was the senior pastor at IEL and Juan Reyes was the assistant pastor.

In November 2005, Ernesto Ramirez, corporate secretary of IEL, accused Juan Reyes, the assistant pastor, of stealing money from IEL. Reyes contended that the monies were sent to a "sister church" in Guatemala, but Ramirez and Moises Sandoval alerted SPLAD to Reyes's alleged theft. Ramirez removed the records and corporate books of IEL, and Nelson Sandoval, the son of Moises Sandoval, removed musical instruments and computer equipment from the church.

SPLAD suspended Reyes from his position as assistant pastor and asked him to stay away from the church. On December 4, 2005, Pastor Moises

Sandoval asked SPLAD to change IEL back to a district counsel church, and SPLAD appointed Raul Castro as IEL's interim pastor. SPLAD superintendent Sergio Navarette convened IEL's board to discuss Sandoval's request.

On December 16, 2005, Navarette, Castro, and Espinoza met with three members of the IEL Board (William Ruiz, Ernesto Ramirez, and Misael Portillo). The two other board members, Moises Sandoval and Reyes, were not present because Navarette, acting on behalf of SPLAD, had advised them to stay away. At this meeting, Navarette told the IEL Board that the National Secretary of the Assemblies of God Church, George Wood, had told Navarette that he was aware of the situation at IEL, and that "if the violence and threats do not calm down," SPLAD should take control and schedule an appointment with the church board to vote and make the change in the status of IEL to district affiliated.

At the meeting, the board members present agreed that SPLAD should take control and supervision of IEL, and voted that the church should change its status from general counsel to district church. SPLAD asserted that as a result of this action—because a general council church which becomes a district affiliated church has no independent board—Navarrete, Castro and Espinosa became the officers and Board members of IEL, and IEL no longer had a board.

On January 11, 2006, IEL transferred 16 properties held in its name to SPLAD pursuant to a grant deed executed by Moises Sandoval and Ernesto Ramirez.[2]

On January 27, 2006, Navarette told the congregation of IEL that Reyes had appealed to the AOG regarding his credentials and ministry, and that Assemblies of God was analyzing his case; Moises Sandoval had moved his ministry to another church; and SPLAD would be, for an indefinite time period, overseeing and supervising the ministries of IEL until "all is back into its biblical order." Moises Sandoval had left IEL to start another ministry because he had received threats and feared for his personal safety.

In spite of SPLAD's December 2005 actions purporting to oust IEL's board, on April 23, 2006, the members of IEL held an election at which they

---

[2] The properties consist of the church building, three houses, and six apartment units containing a total of 24 units.

elected to IEL's board Reyes and four other church members (Epifanio Zepeda, Victoria Carias, Misael Portillo and Gioconda Lopez).[3]

On April 23, 2006, during Sunday services, Reyes and about 15 of his supporters entered the church and attempted to seize the microphone from Pastor Castro. Reyes took another microphone and addressed the congregation. Pastor Castro left the pulpit and proceeded to his office, where he was barricaded until the police were called. Reyes admitted SPLAD had told him to stay away from the church, but several witnesses at trial disputed the assertion that Castro was imprisoned in his office.

On April 19, 2006, Reyes had agreed to accept discipline for one year for ethical misconduct, as stipulated in the Assemblies of God Constitution and Bylaws. At an April 24, 2006 Executive Board of Administration meeting of SPLAD, Navarette, Castro, and Espinoza agreed to return Moises Sandoval to his position as pastor; to dismiss Reyes for failing to comply with his discipline agreement; and to close the church for an indefinite period.

However, on April 23, 2006, SPLAD was unsuccessful in its attempts to change the locks on the church, and Reyes and his supporters continued to use and occupy the church property. They had not sought or obtained permission from SPLAD to use the premises.

### 3. Complaints; Trial; Statement of Decision.

#### (A) Complaints and Pretrial Matters.

On April 24, 2006, Juan Reyes individually and on behalf of IEL filed a complaint for injunction and other relief. Reyes filed a first amended complaint on May 31, 2006, seeking (1) a declaration regarding the parties' rights to the disputed church property; (2) quiet title to the property; (3) cancellation of the trust deed; (4) slander of title; (5) conversion of personal property; (6) slander; and (7) money had and received.[4] Reyes alleged that Ramirez lacked corporate authority to convey IEL's property to SPLAD; SPLAD had taken computers, musical instruments and other property valued at in excess of $50,000 from IEL; SPLAD had slandered Reyes by accusing him of taking money; and SPLAD owed IEL $300,000.

---

[3] At trial, Victoria Carias testified she was elected secretary of IEL at the April 2006 election by a vote of over 400 members of the church. No other evidence concerning the election (i.e., whether it complied with IEL's governing documents or other corporate formalities) was proffered at trial.

[4] The seventh cause of action for money had and received was alleged solely against named defendant Bank of America. The record does not disclose whether Bank of America was served or has appeared in the action.

On May 9, 2006, SPLAD and the SPLAD-controlled IEL (SCI) filed a complaint for ejectment, quiet title, injunctive relief and accounting against Pastor Reyes and other former members of IEL. SPLAD and SCI alleged that on April 23, 2006, Reyes and other members of IEL took possession of the church property without permission of SPLAD. On April 25, 2006, SPLAD and SCI revoked defendants' permission to use and occupy the church premises. Nonetheless, defendants refused to vacate the church premises and threatened physical harm to SPLAD and SCI's agents and employees. SPLAD and SCI sought relief: declaring that SPLAD was the owner of the property; ejecting defendants from the premises; enjoining them from interfering with SPLAD and SCI's right to use and enjoy the church property; and providing an accounting of tithes and other monies collected while defendants used and occupied the premises.

On May 10, 2006, SPLAD filed an action for forcible detainer against Pastor Reyes and other former members of IEL seeking to regain possession of the church.

On June 7, 2006, the three actions were consolidated.

On August 2, 2006, Edythe Bronston was appointed receiver to take possession of and manage the church property.

On June 29, 2007, the trial court granted summary adjudication in favor of SPLAD on Reyes's sixth cause of action for slander (Reyes was the only party seeking relief on this claim), and granted summary adjudication in favor of SPLAD on IEL's punitive damages claims on the fourth, fifth, and sixth causes of action. Because Reyes appeared as an individual only in the sixth cause of action, judgment was entered against Reyes on August 16, 2007.

(B) *Trial.*

A bifurcated trial commenced on August 30, 2007. The first phase addressed the issue of standing: whether Reyes and the church purporting to be IEL had standing to bring the action. After concluding Reyes and IEL lacked standing, the court ruled for SPLAD on IEL's claims, and commenced the second phase of the trial on SPLAD's claims for damages and equitable relief. The evidence presented at trial consisted of the parties' governing documents, and testimony concerning the meaning of those documents, the events of December 2005 through April 2006, and SPLAD's damages.

Sergio Navarette, the superintendent of SPLAD, testified that if a general council church is not in compliance with the Assemblies of God Constitution, the superintendent of SPLAD can declare the church to be a district council

church, in which case SPLAD takes control of the church and governs it. SPLAD can therefore designate the members of the board of directors of the district council church. Because SPLAD controlled the corporate functions of SCI, SPLAD's board became the board of directors of SCI.

IEL argued that SPLAD did not comply with California Corporations Code provisions specifying the requirements for the transfer of property owned by religious nonprofit corporations and the conveyance did not comply with SPLAD's own governing documents. SPLAD argued that under ecclesiastical doctrine, its constitution and bylaws gave it the absolute authority to resolve the dispute in the manner that it did; further, because the ecclesiastical doctrine insulated its actions from review, the trial court was without authority to set aside the transfer. Moreover, even if the ecclesiastical doctrine did not apply, under "neutral principles" of law, SPLAD should prevail on its claims because Reyes and his supporters had no standing to pursue the lawsuit in that Reyes had been terminated, and any board purporting to act on behalf of IEL was not recognizable by SPLAD; and the district council acted properly under the Corporations Code in transferring the property.

In response to the court's request, the parties filed supplemental briefs concerning the applicability of Corporations Code section 9142[5] and the decision in *Episcopal Church Cases* (2007) 152 Cal.App.4th 808 [61 Cal.Rptr.3d 845], review granted September 12, 2007, S155094. SPLAD argued that section 9142 did not apply because there was no evidence any trust had been created by or for the benefit of IEL; further, even if the church property were held in trust, Reyes and his supporters had no standing under section 9142. IEL argued that SPLAD had not met section 9142's requirements because neither IEL's bylaws or articles, nor the governing documents of SPLAD, provided for the creation of a trust.

 (C) *Statement of Decision.*

On October 5, 2007, the trial court issued its statement of decision. On IEL's complaint, the court found the parties lacked standing because both Reyes and the church purporting to be IEL based their corporate status on the April 2006 election. The court found the meeting held April 23, 2006, was not a corporate meeting of SCI, but rather a meeting of the members of the church calling itself IEL because on December 16, 2005, the duly elected board of SCI (consisting of members of SPLAD due to the demotion of IEL to a district council church) relinquished control to SPLAD.

On SPLAD's claims, the court relied on *Episcopal Church Cases, supra,* 152 Cal.App.4th 808 and concluded that because the Assemblies of God is a

---

[5] All statutory references herein, unless otherwise noted, are to the Corporations Code.

hierarchical church, IEL had agreed to be governed by Assemblies of God and SPLAD's constitution and bylaws, which gave SPLAD the absolute authority to resolve disputes, including permitting SPLAD to hold title to its real and personal property.[6] Based on that affiliation, the trial court refused to interfere with SPLAD's authority to govern itself, including decisions regarding property, and entered judgment for SPLAD on its quiet title claim. On its forcible detainer claim, the court found for SPLAD, but found its witnesses had failed to establish damages, and that SPLAD could not enjoin defendants from attending church unless they engaged in disruptive conduct.

The trial court entered judgment on November 7, 2007,[7] and Reyes's supporters vacated the church on that date. On January 25, 2008, IEL filed a petition for writ of supersedeas, seeking return of the possession of the church pendente lite. We denied the petition on November 19, 2008.

## DISCUSSION

This appeal presents two issues: (1) Did SPLAD validly assume control of IEL's corporate form on December 16, 2005,[8] and (2) upon doing so, could SPLAD validly transfer property held in IEL's name to itself? The resolution of these issues requires us to evaluate the extent to which they implicate neutral principles of law, and to the extent they do, to apply such principles to resolve the issues in accordance with the Supreme Court's recent decision in *Episcopal Church Cases, supra,* 45 Cal.4th 467.

### I. *UNDER NEUTRAL PRINCIPLES OF LAW, SPLAD IMPROPERLY ASSUMED CORPORATE CONTROL OF IEL AND HAD NO AUTHORITY TO TRANSFER IEL'S REAL PROPERTY TO ITSELF.*

#### A. *Standard of Review.*

To interpret and construe the governing documents at issue, we apply neutral principles of law de novo. (*Concord Christian Center v. Open Bible Standard Churches* (2005) 132 Cal.App.4th 1396, 1408–1409 [34 Cal.Rptr.3d 412].) Where, as here, the language of a writing (the corporate documents) is

---

[6] The trial court's statement of decision refers to "Exhibit 201," Assemblies of God's constitution and bylaws, when it apparently meant to refer to exhibit 202, SPLAD's constitution and bylaws. Both parties agree that Exhibit 201 was also admitted to the record as exhibit 36.

[7] On October 12, 2007, IEL moved for a new trial or in the alternative to set aside the statement of decision. The trial court denied the motion on November 16, 2007.

[8] Subsumed within this first issue is the question of whether Reyes and named appellants have standing to pursue the action on behalf of IEL. Because this issue turns on resolution of the validity of SPLAD's takeover of IEL's corporate form, we discuss it *post* at part II.

unambiguous, its interpretation is solely a judicial function, with the threshold question of ambiguity also a question of law. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Appelton v. Waessil* (1994) 27 Cal.App.4th 551, 554–555 [32 Cal.Rptr.2d 676].) Further, extrinsic evidence may not be used to contradict or vary the terms of an unambiguous writing. (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343–344 [9 Cal.Rptr.3d 97, 83 P.3d 497]; cf. *Bollengier v. Doctors Medical Center* (1990) 222 Cal.App.3d 1115, 1131 [272 Cal.Rptr. 273] [parties presented evidence concerning interpretation of corporate bylaws].) Therefore, although at trial SPLAD proffered extrinsic evidence concerning the meaning of the parties' governing documents, it is not dispositive in our de novo review.

B. *Discussion.*

1. *The "Neutral Principles" Doctrine.*

■ As the Supreme Court recently clarified, secular courts, when resolving church property disputes, must not entangle themselves in disputes over church doctrine or infringe the free exercise of religion. (*Episcopal Church Cases, supra*, 45 Cal.4th at pp. 478–479.) *Episcopal Church Cases* relied in part on the United States Supreme Court's rulings which stated that how state courts resolve church property disputes is a matter of state law, and that the method chosen must not violate the First Amendment.[9] (45 Cal.4th at pp. 478–479.)

In the nineteenth century, courts used the "English Rule," based upon English law, and imposed an implied trust to resolve property disputes in church cases. That rule provided that in the absence of express language governing disposition in the event of a dispute, the court would make an investigation into the doctrinal beliefs of the disputing parties, and imply a trust in favor of the party whose beliefs most closely adhered to the true standard of faith of the church organization. (See *Watson v. Jones* (1871) 80 U.S. 679, 727–728 [20 L.Ed. 666] (*Watson*).) After abandoning the "English Rule," and its constitutional problems,[10] courts resolved church

---

[9] The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." (U.S. Const., 1st Amend.) The First Amendment is applicable to the states through the Fourteenth Amendment. (*Presbyterian Church v. Hull Church* (1969) 393 U.S 440, 441 [21 L.Ed.2d 658, 89 S.Ct. 601].)

[10] As noted in *Protestant Episcopal Church v. Barker* (1981) 115 Cal.App.3d 599 [171 Cal.Rptr. 541] (*Barker*), the implied trust fails as a theory of recovery because it "almost inevitably puts the civil courts squarely in the midst of ecclesiastical controversies," because determining the beneficiary of such a trust would require the court to consider who was the holder of the "true faith," and therefore to make decisions based upon doctrine. (*Id.* at p. 618.)

property disputes using the hierarchical theory, under which civil control of church property was subordinated to the ecclesiastical control of a hierarchical church. In *Watson, supra*, 80 U.S. 679, the Supreme Court set forth this theory, holding that where a church has superior ecclesiastical tribunals possessing the ultimate power of decision over subordinate churches, the superior body's decision on church property disputes controlled to the exclusion of the civil courts.[11] (80 U.S. at pp. 728–729.)

Later, *Presbyterian Church v. Hull Church, supra*, 393 U.S. 440 (*Hull*) signaled a significant shift in the high court's legal theory regarding church property disputes. There, the Supreme Court declared that "[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. . . . Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. . . . But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. . . . [T]he [First] Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." (*Id.* at p. 449.) "[N]eutral principles of law, developed for use in all property disputes . . . can be applied without 'establishing' churches to which property is awarded." (*Ibid.*)

In *Jones v. Wolf* (1979) 443 U.S. 595 [61 L.Ed.2d 775, 99 S.Ct. 3020], the Supreme Court confirmed that a state is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute. (*Id.* at pp. 602–604.) The court clarified that, subject to the limitations set forth in *Hull* on secular court review or application of doctrine, the First Amendment does not dictate that a state must follow a particular method of resolving church property disputes. (443 U.S. at pp. 602–604.) Endorsing the "neutral principles" approach, *Jones v. Wolf* commented that "[t]he primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to

"Almost inevitably, implied trust entangles the court in the disputants' conflicting views of church policy, where theological and legal principles may be closely interwoven." (*Id.* at pp. 616–617.)

[11] In the case of congregational church, i.e., a church governed solely by itself, property disputes were determined by the ordinary principles governing voluntary associations. Thus, for example, if the principle of government in the church is that majority rules, the numerical majority controls the property at issue. Such approach avoids inquiry into religious opinions and avoids the use of a trust. (*Watson, supra*, 80 U.S. at pp. 725–726.)

lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. . . . Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy." (*Id.* at p. 603.) ▉ However, in applying the neutral principles approach, the secular court must take care not to rely on religious precepts in analyzing documents to determine property disputes. (*Id.* at p. 604.)

Until the Supreme Court's recent decision in *Episcopal Church Cases*, the leading California case applying the neutral principles approach to a church property dispute was *Barker, supra*, 115 Cal.App.3d 599. In *Barker*, four local churches disaffiliated themselves from the Episcopal Church's national organization and sought to take their parish property with them. (*Id.* at pp. 607–611.) *Barker* rejected the "hierarchical theory," under which all church decisions are insulated from secular court review, applied the "neutral principles" test of *Jones v. Wolf, supra*, 443 U.S. 595, and held that property disputes should be resolved through an examination of (1) manner of holding title; (2) articles of incorporation of the local churches; (3) the constitution, canons and rules of the general church; and (4) relevant state statutes. (*Id.* at pp. 620–625.) Applying this rule to the case before it, the court found three of the four churches did not hold their local property in express trust for the benefit of the national church. (*Id.* at pp. 625–626.)

▉ In *Episcopal Church Cases, supra*, 45 Cal.4th 467, the Supreme Court confirmed that California courts should apply the neutral principles approach to resolve church property disputes. In doing so, "State courts must not decide questions of religious doctrine; . . . the court must defer to the position of the highest ecclesiastical authority that has decided the point. But to the extent the court can resolve a property dispute without reference to church doctrine, it should apply neutral principles of law. The court should consider sources such as the deeds to the property in dispute, the local church's articles of incorporation, the general church's constitution, canons, and rules, and relevant statutes, including statutes specifically concerning religious property, such as Corporations Code section 9142." (*Id.* at p. 485.)

*Episcopal Church Cases* involved a local parish of the national Episcopal Church that withdrew from the national organization after a doctrinal dispute over the national church's ordination of an openly gay man. The local parish sought to establish its ownership of the local church property. (*Episcopal Church Cases, supra*, 45 Cal.4th at pp. 475–476.) Applying the principles of Corporations Code section 9142, subdivisions (c) and (d), the Court held that under the governing documents of the local church and the national church,

all church property reverted to the national church upon disaffiliation. "St. James Parish agreed from the beginning of its existence to be part of a greater denominational church and to be bound by that greater church's governing instruments. [Under those documents,] a local parish owns local church property in trust for the greater church and may use that property only so long as the local church remains part of the greater church." (*Id.* at p. 489.) In particular, a canon in the national church's governing documents created an express trust in favor of the national church. " 'All real and personal property held by or for the benefit of any Parish . . . is held in trust for this [national] Church and the Diocese thereof . . . .' " (*Id.* at p. 475.)

In an earlier case, *Concord Christian Center v. Open Bible Standard Churches* (2005) 132 Cal.App.4th 1396 [34 Cal.Rptr.3d 412] (*Concord Christian*), a local church (Concord Christian) withdrew from its national church (Open Bible) and sought control over its local assets. Open Bible required its local church's articles of incorporation to conform with those of the national church; each affiliated church agreed to be bound by the policies and principles of Open Bible; property of the local church could not be sold without consent of the Open Bible; and an individual church could not withdraw from membership without following a nationally prescribed procedure. (*Id.* at pp. 1399–1401.) As part of its control over local churches, Open Bible's bylaws provided that a local church could seek regional supervision in the event of disorder in the local church. A church under local supervision was governed by the regional board of directors, until released from regional supervision. (*Id.* at pp. 1401–1402.) Concord Christian's own bylaws affirmed that they were in accord with Open Bible's bylaws and, upon affiliation with Open Bible, Concord Christian amended its bylaws to provide that in the event of liquidation, Concord Christian's assets would be transferred to Open Bible. (*Id.* at p. 1402.)

Concord Christian, formed in 1953, ran a church and a day school; all of its assets had been purchased with funds from Concord Christian's membership. However, membership began to dwindle after 1982; Open Bible instituted an investigation and imposed regional supervision, and permitted the pastor to remain at his post. (*Concord Christian, supra,* 132 Cal.App.4th at pp. 1402–1403.) By 1998, membership was down to 28, and the church no longer held worship services. In 2000, Open Bible released Concord Christian from regional supervision; the pastor began to take steps to disaffiliate from Open Bible, resulting in a further drop in membership to 18 persons. (*Id.* at pp. 1404–1405.) In 2001, Concord Christian adopted new bylaws, and informed Open Bible it was withdrawing from membership in the national church. After a hearing, Open Bible suspended the pastor's ministerial credentials, and Concord Christian again amended its bylaws to delete all reference to Open Bible. (*Id.* at pp. 1405–1406.)

■ *Concord Christian* held that under the ecclesiastical doctrine, the pastor's termination was insulated from review. (*Concord Christian, supra,* 132 Cal.App.4th at p. 1413.) "To the extent the interpretation or construction of [the parties' governing documents] involves the resolution of a matter of ecclesiastical doctrine, polity or administration, the civil court must defer to the resolution of the issue by the 'authoritative ecclesiastical body.' [Citation.] Significantly, such ecclesiastical matters include not only issues of religious doctrine per se, but also issues of membership, clergy credentials and discipline, and church polity and administration." (*Id.* at p. 1411.) However, with respect to other issues concerning governance, *Concord Christian* found by reference to the churches' governing documents that under neutral principles of law the trial court could void the local church's withdrawal from the national organization and affirm the imposition of regional supervision. (*Id.* at pp. 1414–1415.)

In *Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik* (2004) 118 Cal.App.4th 919 [13 Cal.Rptr.3d 552], the Polish National Catholic Church (PNCC), a hierarchical church, had rules that were binding on all parishes within the church. In 1960, Guardian Angel parish incorporated in Los Angeles. According to PNCC's constitution, a parish was " 'a collective legal unit within the realm of the [PNCC] possessing a charter or recognition of the Bishop Ordinary of the diocese in whose territory the parish is located, confirmed by the Prime Bishop and organized according to the Constitution, principles, laws and rules of the [PNCC].' " (*Id.* at p. 921.) Further, the constitution provided that a parish subscribed to and was bound by all provisions of the constitution and other laws, rules, regulations and customs of the PNCC. PNCC's articles of incorporation contained provisions that defined authority in terms of the religious and the temporal; religious authority rested solely in the bishops, while temporal authority and administration of their business affairs was ceded to the parishes. (*Id.* at pp. 922–923.)

In 1963, Guardian purchased property, but PNCC took title. According to PNCC's constitution, the physical property of a parish church belonged to the members of the parish who conformed to the provisions of PNCC's constitution, laws, rules, and regulations. A parish could not be liquidated without permission of the prime bishop and supreme council of PNCC; in the event of a liquidation, all the parish's property became the property of PNCC. Guardian Angel's bylaws also provided that no assets could be liquidated without permission of the prime bishop and supreme council, and upon liquidation, all property became property of PNCC. (*Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik, supra,* 118 Cal.App.4th at pp. 923–924.)

Governance of the parish resided in the hands of the parish as a whole and a board of directors. Further, Guardian Angel's bylaws recognized the authority of the PNCC and therefore PNCC's constitution, rules and regulations comprised part of Guardian Angel's parish bylaws. PNCC's constitution provided that control over property of the parish belonged to the parish committee elected by the parish and confirmed by the diocesan bishop and was " 'strictly dependent upon and answerable to the lawful church authorities.' " Parish committee powers were expressly subject to the constitution, laws, rules and regulations of the PNCC. A parish committee had no authority to act until confirmed by the diocesan bishop. (*Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik, supra*, 118 Cal.App.4th at pp. 924–925.)

A new pastor was appointed in 1998; in 1999, he refused to provide the diocesan bishop with financial information concerning operation of Guardian Angel's parish. The bishop removed the pastor. The parish board elected in December 1999 did not submit its confirmation form to the diocesan bishop, and he did not approve its election. The unapproved board voted in September 2000 to sever all ties with PNCC; refused to recognize the replacement pastor; resolved to deny PNCC access to Guardian Angel's property; and amended its articles of incorporation to repeal those portions of the bylaws pertaining to parish liquidation. Guardian Angel refused access to parish members who remained loyal to PNCC, although the bishop had approved a parish committee which remained loyal to PNCC. (*Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik, supra*, 118 Cal.App.4th at p. 926.)

The court held that all acts of the unapproved board of directors were a nullity; as a consequence, the parties were returned to the status quo ante, which meant that Guardian Angel remained a parish of PNCC and the parish property belonged to those members who conformed to PNCC's governing documents. (*Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik, supra*, 118 Cal.App.4th at p. 927.) Further, applying neutral principles of law and relying on the categories of governing documents set forth in *Barker*, the court found that because PNCC was a hierarchical church and provisions of Guardian's governing documents evidenced an intent to follow a national constitution and be part of the national church, Guardian Angel was bound by PNCC's governing documents. These documents contained express reversionary clauses providing that parish property would inure to the church upon parish liquidation or dissolution, and that a parish could not be liquidated without PNCC permission. (118 Cal.App.4th. at pp. 930–931.) These governing documents therefore stated two principles: first, that the local parish owned parish property only so long as it conformed to PNCC laws, rules, and regulations; and second, upon liquidation or dissolution, parish property reverted to the national church. Because California law presumed a trust in

religious assets to the extent the articles and bylaws of a the corporation, or the governing documents of a superior religious body of which the corporation was a member so expressly provided, *Guardian Angel* concluded that pursuant to section 9142, subd. (c)(2), Guardian Angel held the assets in trust. (118 Cal.App.4th at pp. 930–931.)

> 2. *Under Neutral Principles of Law, SPLAD's Assumption of Control Over IEL and Conveyance of Its Property Was Improper.*

> (a) *Assumption of Control of IEL's Board.*

IEL contends that the trial court erred in finding that SPLAD could legally, under the parties' various governing documents, take control of IEL's local church corporation. Here, IEL's bylaws specify a five-member board, not the three-member SPLAD board that took over after their self-appointment at the meeting of December 16, 2005; even if IEL were demoted to district council status, this cannot amount to total surrender of corporate autonomy; and only voting members can elect a board, rendering SPLAD's election invalid.[12] (§§ 9210, 9220, 9222.) SPLAD contends that Assemblies of God is a hierarchical church, SPLAD is a regional body within the Assemblies of God having supervision over all of the ecclesiastical and sacerdotal activities of subordinate local churches, and its bylaws give it exclusive authority to resolve disputes between factions within a local church. Therefore, the dispute giving rise to this litigation solely implicates issues of religious doctrine and internal church governance, requiring our deference to SPLAD's actions because they constitute "questions regarding religious doctrine or policy . . . and internal church governance on which we must defer to the greater church's resolution." (See *Episcopal Church Cases, supra*, 45 Cal.4th at p. 485.) Further, even if we apply neutral principles, SPLAD's bylaws gave it the authority to take over IEL and convey its property.

██ Pursuant to *Episcopal Church Cases*, the state has an interest in resolving, and indeed an obligation to resolve, secular corporate disputes that do not implicate matters of doctrine. (*Episcopal Church Cases, supra*, 47 Cal.4th at p. 478.) ██ Here, we conclude that SPLAD erroneously believed that

---

[12] IEL also contends substantial evidence does not support four of the trial court's findings of fact: (1) on December 15, 2005, Navarette received a memorandum that IEL be made a district council church; (2) on December 16, 2005, SPLAD held an election at which it replaced the board of IEL; (3) after SPLAD assumed control of IEL, it never relinquished such control, and (4) on January 11, 2006, IEL transferred title to its 16 parcels of real property to SPLAD. Because these factual findings also implicate issues of law, we consider their support in the evidentiary record as factual findings to the extent necessary to resolve the issues on appeal and, to the extent these facts are also conclusions of law, we address them as such.

because its hierarchical structure and governing documents permitted it to demote IEL to district council church status upon the request of a board member, it could ignore IEL's corporate form and applicable statutory and other corporate formalities in taking control of the church. The rule of deference to ecclesiastical decisions, such as to the decision to change IEL's status from general council church to district council church, does not require us to ignore IEL's secular corporate form. Because we can resolve the issue of whether SPLAD's corporate takeover of IEL was proper without reference to Assemblies of God church doctrine, we apply neutral principles of law to this dispute.

Religious corporations in California are governed by part 4 of the Nonprofit Corporation Law (§ 9110 et seq.).[13] Religious corporations are legal entities and may adopt, amend and repeal bylaws, issue memberships, levy dues, assessments and fees, make donations, enter into contracts, and borrow money. (§ 9140.) They may also sell, lease, convey, exchange, and transfer all of their assets when the principal terms are approved by the board and, unless in the ordinary course of business, approved by the members. (§ 9631, subd. (a).) With respect to governance, section 9222 provides any and all directors may be removed without cause if the removal is supported by the members of the corporation. (§ 9222, subd. (a).) Pursuant to section 9211, board meetings may be called by the chair of the board or the president or any vice president or the secretary or any two directors, and special meetings of the board shall be held upon four days' notice by first-class mail or 48 hours' notice delivered personally or by telephone. Section 9211 provides that "[a]n act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present is the act of the board. The articles or bylaws may not provide that a lesser vote than a majority of the directors present at a meeting is the act of the board. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting, or a greater number as is required by this division, the articles or bylaws."

---

[13] Most of the provisions governing religious corporations (pt. 4 of the Nonprofit Corporation Law, § 9110 et seq.) are similar or identical to those governing public benefit corporations (pt. 2 of the Nonprofit Corporation Law, § 5110 et seq.) and some provisions incorporate by reference provisions from the statutes governing public benefit corporations. The law " 'avoids tying the definition of religious corporation to the tax definition of churches, their integrated auxiliaries or religious orders, as the tax definition may fluctuate with changing regulations and interpretations of tax law. Because of the First Amendment status of religions and a less compelling state interest in their internal governance, many provisions dealing with Religious Corporations, while based in Public Benefit sections, can be varied by the corporation's articles and bylaws. Several aspects of the governance of Religious Corporations do not, however, involve unique considerations and simply incorporate chapters governing Public Benefit Corporations.' " (9 Witkin, Summary of Cal. Law (10th ed. 2005) Corporations, § 382, p. 1119, quoting Assembly Select Committee.)

IEL's bylaws provide that its board shall have five directors; the number may be changed only by an amendment, or repeal and adoption of a new bylaw relating to directors. (IEL Bylaws, art. 3, § 1.) Board members serve until the next election, and until their successor is selected and qualified. (IEL Bylaws, art. 3, § 4.) Special meetings may be called by the chairperson of the board, other officers, or by any two directors. (IEL Bylaws, art. 3, § 8.) Special meetings are to be held in compliance with section 9211. (IEL Bylaws, art. 3, § 9.) A quorum consists of three directors, and no business may be transacted unless such a quorum is present. (IEL Bylaws, art. 3, § 12.) A vacancy on the board shall exist upon the death, resignation or removal of a director; except for a vacancy created by the removal of a director by the members, if any, of the corporation. Vacancies on the board may be filled by approval of the board or, if the number of directors then in office is less than quorum, by unanimous written consent. (IEL Bylaws, art. 3, § 16.)

As these provisions demonstrate, IEL must observe certain formalities in conducting board elections. Other than its reliance on Assemblies of God and SPLAD's constitution and bylaws, there is no evidence in the record SPLAD complied with the California Corporations Code or IEL's bylaws in conducting its corporate takeover and giving notice of the special meeting on December 16, 2005. Furthermore, unlike Concord Christian's bylaws, which contained specific provisions that a local church could seek regional supervision and in such case would be under control of a regional board of directors (*Concord Christian, supra*, 132 Cal.App.4th at pp. 1401–1402), nothing in SPLAD's constitution or bylaws addresses the demotion of a general council church to a district council church, except for the reference in its bylaws to district council churches being subject to the direct supervision of the presbytery, and that such churches include "former sovereign Assemblies of God church programs that have surrendered their sovereignty temporarily or otherwise seek District council protection. . . ." (SPLAD Const., art. XIII, § 3.) In turn, the AOG Constitution provides that district council churches are under supervision to the district council in accordance with the district council constitution and bylaws. (AOG Const., art. XI, § 2.) These provisions are insufficient to permit SPLAD to ignore IEL's corporate form; the fact that Assemblies of God is a hierarchical church and SPLAD has oversight over district council churches is insufficient, without express provisions such as those found in *Concord Christian*, to transmit the power to SPLAD to ignore IEL's corporate form in the event of a change in IEL's status.

Finally, we note that at trial, Navarette's testimony was proffered to explain the scope of these governing documents. Although no one argued the governing documents contained ambiguities such that parol evidence would have been admissible, the trial court admitted the evidence. We find Navarette's testimony of limited utility because the testimony varies the unambiguous terms of the parties' documents, and provides terms that do not exist.

In the absence of more specific directives in the parties' documents, Assemblies of God's and SPLAD's sovereignty with respect to the supervision and control of district council churches cannot be read to supplant IEL's own bylaws. IEL did not amend its bylaws to permit a corporate takeover in the event of a demotion to a district council church. Furthermore, nothing in the facts of this case suggest that district council guidance was sought because of a *doctrinal* dispute; rather, Pastor Reyes had been accused of sending money to a sister church in El Salvador. This purely secular matter, while undoubtedly of concern to SPLAD and Assemblies of God, can be resolved with reference to neutral principles of law.[14]

---

[14] At oral argument, the parties cited *New v. Kroeger* (2008) 167 Cal.App.4th 800 [84 Cal.Rptr.3d 464], in which a faction of the congregation of a local parish belonging to the national Episcopal Church resigned its membership with the Episcopal Church and affiliated itself with an Anglican church in Uganda. They held elections and amended the local parish's articles of incorporation and bylaws to delete all references to the national church organization and provisions stating that the local parish would be subordinate to and in conformance with the Episcopal Church's superior governing body. The faction held elections for a new board. However, the bishop of the intermediate body of the ecclesiastical church, the diocese that oversaw the local parish, determined that the remaining loyalist members of the parish constituted the true church, and the faction's actions violated the constitution and canons of the Episcopal Church and its members were no longer qualified to serve because the Episcopal Church's governing documents contained specific provisions that dissolution required consent of the bishop. The diocese therefore installed loyalist members as the parish's board. (*Id.* at p. 812.) The loyalist members filed a declaratory relief action under section 9418, seeking to determine that they were the duly elected board of the local parish. (167 Cal.App.4th at pp. 812–813.) Relying solely on California corporate law, the trial court found that the diocese acted improperly and that the court need not defer to the higher church or the diocese because the court was not determining who the "true members" of the church were. (*Id.* at pp. 813–814.)

The Court of Appeal reversed, finding that the trial court erred in failing to apply neutral principles of law to the corporate documents of the hierarchical Episcopal Church. Those documents required deference and conformity of local parish churches' governing documents to that of the national church. (*New v. Kroeger, supra*, 167 Cal.App.4th at p. 820.) The Court of Appeal found that by resigning from the national organization, the faction of the church lost its authority to amend its articles of incorporation and bylaws and its members were no longer directors of the corporation. (*Id.* at p. 823.) On the issue of who would constitute the replacement board, the Court of Appeal concluded that it must defer to the Episcopal Church because the determination of the "true members" of the church required consideration of doctrine. (*Id.* at p. 827.) "The Bishop determined that by renouncing their membership in the Episcopal Church, [the faction members were] no longer qualified to serve as members of the parish vestry and that the loyalist minority were the true members of the parish. . . . As a matter of canon law, that vestry became the board of the parish corporation." (*Ibid.*)

*New v. Kroeger* is distinguishable on its facts because there, the governing documents provided that the resigning members lacked any authority to take the actions they did. Here, there are no such provisions in the parties' corporate documents. Rather, the only express provisions in Assemblies of God's or SPLAD's documents relating to governance of a local church deal solely with a church's status as district council affiliated or general council affiliated, and do not address the contingency of board governance in the event of a takeover.

(b) *SPLAD Did Not Have the Authority to Convey IEL's Property to Itself Based upon the Contingency of IEL Reverting to the Status of a "District Council Church."*

We note that *Episcopal Church Cases*, while adopting the approach of *Barker* to its analysis of the governing documents of the various parties and relevant statutes and finding an express trust, did not limit theories of recovery over disputed church property to an express trust theory. In our case, Reyes did not seek recovery of IEL's property on a trust theory, but rather relied on ordinary common law property principles (quiet title, cancellation of deed). Because such common law rules are "neutral principles of law," we follow them to resolve the dispute before us.

IEL's bylaws provide that the board of directors may by resolution authorize any officer or agent of the corporation to enter into contracts or execute any instrument on behalf of the corporation. (IEL Bylaws, art. 6, § 1.) SPLAD purported to use this power to have the remaining board members convey IEL's property to SPLAD; however, the parties' governing documents do not support this exercise of power.

Unlike documents in *Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik, supra,* 118 Cal.App.4th 919, which contained specific provisions concerning the disposition of local church property, nothing in the parties' governing documents here addresses the ownership of property by subordinate churches, or the transfer of property from a district council church to the district council. The mere fact that Assemblies of God is a hierarchical church and SPLAD has oversight over district council churches is insufficient, without such express provisions, to transmit the power to SPLAD to convey IEL's property to itself in the event of a change in IEL's status. Assemblies of God's constitution and bylaws provide that sovereign council churches have the power to elect their own boards and transact all business pertaining to their lives as a local unit. A general council church has the "right to acquire and hold title to property, either through trustees or in its corporate name as a self-governing unit. The fact [a general council church] is affiliated with The General Council of the Assemblies of God shall in no way destroy its rights as above stated or interfere with its sovereignty." (AOG Const., art. XI, § 1(c).) SPLAD's constitution provides it may own and sell property as a California corporation. (SPLAD Const., art. IV, § 4.) Its bylaws provide that all properties held by the district council or held by it in trust shall be deeded to the district council in its official corporate name and the Executive Presbytery of SPLAD shall have oversight and management of property owned or held in trust by the district council. (SPLAD Const., art. IV, § 6.) Any transfers or sales of real property require a two-thirds vote of the bodies authorized to conduct such transactions at a regular or special meeting.

Different procedures are followed for properties involving $500,000 or less, properties between $500,000 and $1 million, and properties worth more than $1 million. (SPLAD Const., art. IV, § 7.)

The bylaws further provide that where a district council local church becomes sovereign (i.e., a general council church), "where real and personal property are held by [the] District for that church, it is generally the policy of this District Council to convey and/or sell to the sovereign church corporation the land and improvements acquired and developed through the mutual endeavor of the congregation and other programs within the District." SPLAD requires the legal documents to contain specific conditions requiring the property of the local sovereign church to be distributed to the district council upon dissolution of the local church. (SPLAD Bylaws, art. VII, § 12(f)(5).)

None of these provisions address the transfer of a demoted district council church's real property to SPLAD. Assemblies of God's constitution and bylaws expressly recognize that a local sovereign church, such as IEL did here, owns its property. Nothing in the governing documents provides that the demotion of a sovereign church to a district council church removes this protection. As a result, SPLAD cannot rely on Assemblies of God's hierarchical structure and the express provisions for subordination of churches and the required conformity of each level's documents to Assemblies of God's general council to supplant IEL's ownership. Moreover, SPLAD's governing documents contain express provisions regarding the formalities associated with the transfer of property that SPLAD did not observe. SPLAD did not hold a meeting; it failed to secure the required number of votes; and it had no appraisal of the property to guide its selection of the appropriate formalities.

## II. *REYES HAS STANDING TO PURSUE THIS ACTION ON IEL'S BEHALF.*

SPLAD argues that former members of IEL and Reyes have no standing to assert their claims. SPLAD contends Reyes was removed from the board of IEL in December 2005, and that the April 2006 election purporting to elect a new board for IEL was invalid because it was not in compliance with IEL's bylaws.[15] Furthermore, SPLAD argues that because Reyes was a plaintiff only as to the cause of action for slander, which was dismissed before trial, Reyes has no standing to participate in this appeal. Reyes contends he has standing on both grounds because he was validly elected to IEL's board in April 2006

---

[15] Reyes and his supporters do not challenge Reyes's removal as pastor because they recognize that both SPLAD and Assemblies of God's actions in that regard are protected by the ecclesiastical doctrine. (See *Gunn v. Mariners Church, Inc.* (2008) 167 Cal.App.4th 206, 214 [84 Cal.Rptr.3d 1].)

pursuant to Corporations Code sections 9220 and 9222. We conclude that Reyes and other IEL board members have standing to contest whether SPLAD's takeover was valid and to pursue this action, as well as this appeal.

 Standing is a threshold issue, because without it no justiciable controversy exists. (*CashCall, Inc. v. Superior Court* (2008) 159 Cal.App.4th 273, 286 [71 Cal.Rptr.3d 441].) "Every action must be prosecuted in the name of the real party in interest . . . ." (Code Civ. Proc., § 367.) "Generally, 'the person possessing the right sued upon by reason of the substantive law is the real party in interest.' [Citations.]" (*Del Mar Beach Club Owners Assn. v. Imperial Contracting Co.* (1981) 123 Cal.App.3d 898, 906 [176 Cal.Rptr. 886].) To have standing, a party must be beneficially interested in the controversy, and have "some special interest to be served or some particular right to be preserved or protected." (*Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276].) This interest must be concrete and actual, and must not be conjectural or hypothetical. (*Holmes v. California Nat. Guard* (2001) 90 Cal.App.4th 297, 315 [109 Cal.Rptr.2d 154].)

The trial court's statement of decision states that on April 23, 2006, "over 400 members of IEL held their own election to elect Officers and Board members" and that Reyes, Zapeda, Portillo, Lopez, and Carias were elected to the board. The trial court's finding that those board members lacked standing to pursue the litigation on behalf of IEL was based upon its conclusion that "[t]he meeting held by the members on April 23, 2006 was not a corporate meeting of the corporate entity IEL, but rather a meeting of members of the Church calling itself IEL" and that the board elected on December 16, 2005, was in fact IEL's board.

Here, Reyes has standing to pursue this action on behalf of IEL, the named plaintiff and appellant.[16] As we have concluded, the SCI board election was not in conformity with the parties' governing documents and was invalid. In such circumstance, we are returned to the status quo ante. (*Guardian Angel Polish Nat. Catholic Church of L.A., Inc. v. Grotnik, supra,* 118 Cal.App.4th at p. 927.) The original board of IEL, which included Reyes, may pursue the

---

[16] We note that if Reyes had pursued the case under a theory of breach of trust, section 9142 (applicable to religious corporations) would have conferred standing upon him: "(a) . . . any of the following may bring an action to enjoin, correct, obtain damages for or to otherwise remedy a breach of a trust under which any or all of the assets of a corporation are held: (1) The corporation, a member, or a former member asserting the right in the name of the corporation . . . ."

action on its behalf.[17] As such, the IEL Board is an aggrieved party beneficially interested in ensuring IEL's corporate form is respected, its property safeguarded, and that the parties' governing documents are complied with.

## DISPOSITION

The judgment of the superior court is reversed. IEL's claims for conversion and money had and received are remanded for trial. After trial, judgment is to be entered in favor of IEL on all of SPLAD's claims, and in favor of IEL on IEL's first, second, third and fourth causes of action. Appellants are to recover their costs on appeal.

Perluss, P. J., and Jackson, J., concurred.

Respondents' petition for review by the Supreme Court was denied July 8, 2009, S173315.

---

[17] Thus, while Reyes as an individual may have lost standing due to the unappealed dismissal of his slander claim, he may pursue the action as a former board member of IEL improperly ousted at the December 16, 2005 meeting.